[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No.  11-13117
_____

D.C. Docket No. 2:10-cv-00020-RWS

SARAH JANE UNDERWOOD,

Plaintiff-Appellant,

versus

RITA HARKINS, in her official capacity as
Clerk of the Superior Court of Lumpkin
County, Georgia,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(October 18, 2012)

Before CARNES, MARTIN, and JORDAN, Circuit Judges.

JORDAN, Circuit Judge:

Following the 1860 election, President Abraham Lincoln chose a cabinet

"comprised of enemies and opponents," including three men who had been his "chief

rivals for the Republican nomination," because they "'were the strongest men in the party'" and he "'had no right to deprive the country of their services.'" DORIS KEARNS GOODWIN, TEAM OF RIVALS: THE POLITICAL GENIUS OF ABRAHAM LINCOLN 319 (2005).    When she was elected in 2008 as superior court clerk of Lumpkin County, Georgia, Rita Harkins did not emulate President Lincoln; in her first official act as clerk, Ms. Harkins dismissed her co-worker and former political rival, Sarah Jane Underwood, whom she had defeated in the Republican primary.

The issue we address is whether this firing violated Ms. Underwood's First Amendment rights.  In light of our precedent, we conclude, as did the district court, that it did not.

## I

Ms. Underwood sued Ms. Harkins under 42 U.S.C. § 1983, alleging that her termination was unconstitutional under the First Amendment because it was based on her candidacy.  The district court granted summary judgment in favor of Ms. Harkins, so under Rule 56 we look at the evidence in the light most favorable to Ms. Underwood.  *See, e.g., Curves, LLC v. Spalding County, Ga.,* 685 F.3d 1284, 1289 (11th Cir. 2012).

## A

Under Georgia law, a superior court clerk like Ms. Harkins has a number of

statutory responsibilities and duties: to keep and run the clerk's office; to attend the needs of the court; to issue and sign every paper under authority of the court, including orders to show cause; to keep automated civil and criminal case management systems, as well a docket or file for recording all matters and documents evidencing title to real property; to keep all papers of the clerk's office with care and security; to keep all publications of federal and state law furnished by the state; to procure a substantial seal of office; to make out and deliver a correct transcript and/or any minutes, records, or files in the clerk's office, except for sealed matters; to make notation on all conveyances of real or personal property, including liens, of the date and time they were recorded; to attest deeds and other written instruments for registration; to administer oaths; to submit certain financing statements; to remit a portions of certain fees collected; to participate in the state-wide uniform automated information system; to participate in an authorized clerk's network for the transmission and retrieval of electronic information; to file and transmit all civil case filings and disposition forms, as well as certain data; to participate in agreements, contracts, and networks necessary for the performance of duties required by law; and to perform such other duties as required by law or as necessarily applicable to the office of clerk of superior court.  *See* GA. CODE ANN. §15-6-61(a)(1)-(21) (2012). A superior court clerk must execute a bond of $150,000 and is "liable to rule" if she

does not "faithfully account" for any money received. *See* GA. CODE ANN. §§ 15–6-59(a), 15-6-83 (2012).

Georgia law gives each superior court clerk the power to appoint one or more deputies, and to require from them a "bond with good security." *See* GA. CODE ANN. § 15-6-59(b) (2012).   It also provides that the "[p]owers and duties of deputy clerks shall be the same as those of [superior court] clerks." GA. CODE ANN. § 15-6-59(b) (2012).   Thus, a deputy clerk like Ms. Underwood is statutorily authorized to carry out the same tasks as the clerk, who is her superior. *See Hendrick v. State,* 354 S.E.2d 433, 434 (Ga. 1987) ("By statute, the deputy clerk has the same power and duties as those of the clerk of the court."); *Green v. State,* 175 S.E. 26, 27-28 (Ga. Ct. App. 1934) (deputy clerks are empowered to take affidavits upon which warrants may be issued); *Ledbetter v. State,* 58 S.E. 1106, 1107 (Ga. Ct. App. 1907) (deputy clerks can receive indictments).

In Lumpkin County, the position of superior court deputy clerk is not protected by the civil service system.   That means that a deputy clerk is an at-will employee subject to discharge by the clerk. *See Thomas v. Lee,* 691 S.E.2d 845, 847 (Ga. 2010) (a public employee who is not covered under the civil service system "lacks a protected property interest in her employment," and can "be terminated without cause").

4

**B**

In 2004, while Edward Tucker served as the elected superior court clerk for Lumpkin County, Ms. Underwood became one of the two deputy clerks. By 2009, she and Ms. Harkins were two of the three deputy clerks working under Mr. Tucker.

As a deputy clerk, Ms. Underwood was the administrative assistant to Mr. Tucker, helping him create and maintain confidential personnel records and files – which Mr. Tucker kept under lock and key – and handling "any things he needed throughout the day as a secretary would do." Mr. Tucker was a very "hands-on" clerk who was "seldom out of the office," but if he was not available Ms. Underwood could do things like swear in notaries. Ms. Underwood did not set policies for the clerk's office. Nor did she perform duties statutorily assigned to Mr. Tucker.

Ms. Underwood also worked in the adoption and juvenile divisions of the clerk's office, and in 2006 she began handling accounting duties. As the accountant, Ms. Underwood paid jurors, handled the accounts receivable and accounts payable, received bonds and funds to be placed in escrow, maintained the office's general ledger, reconciled nine bank accounts, and assisted Mr. Tucker (who gave her general directions) with the budget. Ms. Underwood "reported mainly to Mr. Tucker."

Ms. Underwood and Ms. Harkins were cordial to each other, but they generally

5

did not socialize.  Their duties as deputy clerks did not overlap, as Ms.  Harkins was in charge of the criminal court division, and the two therefore had little interaction at work.

## C

In 2008, Mr. Tucker, who was a Republican, announced that he was not going to seek re-election as superior court clerk, a position he had held since 1973.  Ms. Harkins and Ms. Underwood each decided to seek the Republican nomination for clerk, and they ran against each other, and two other candidates, in the Republican primary.   This caused "some" tension in the clerk's office.  One employee in the nine-person clerk's office publicly supported Ms. Underwood, while another employee publicly supported Ms. Harkins.

None of the candidates in the Republican primary for clerk won a majority of the vote; Ms. Underwood received one of the two lowest vote totals and was eliminated, while Ms. Harkins faced off against another candidate in a runoff she ended up winning.  When no Democrat qualified to run in the election, Ms. Harkins became the superior court clerk by having won the Republican primary.

The primary contest in which Ms. Underwood and Ms. Harkins participated was "not contentious" and focused on the candidates' experience.  Ms. Underwood did not make any statements critical of Ms. Harkins during the campaign, and Ms.

6

Harkins likewise did not make any statements critical of Ms. Underwood. Ms. Underwood did not congratulate Ms. Harkins, or correspond with her, after learning that Ms. Harkins would be the new superior court clerk. Nor did she discuss her job situation with Ms. Harkins, or tell her that she wished to remain working in the clerk's office (as a deputy or in any other position), because she assumed that, as Ms. Harkins had said (before learning that Ms. Underwood was going to be a candidate), no one in the clerk's office would be losing his or her job. As Ms. Underwood saw it, her relationship with Ms. Harkins remained the same after the campaign, except that maybe Ms. Harkins avoided coming by her desk.

In her first official act upon becoming clerk, Ms. Harkins fired Ms. Underwood. Ms. Harkins did not dismiss any other employee of the clerk's office. Though she did not give Ms. Underwood a reason for the termination, for purposes of summary judgment Ms. Harkins admitted that she fired Ms. Underwood because she had run for the office of clerk in the Republican primary.

## II

First Amendment jurisprudence in the area of firings based on political affiliation or candidacy is, at best, muddled. We do not pretend to eliminate all of the confusion with this opinion, but we hope that we can at least harmonize our existing cases and enunciate a workable and relatively predictable standard. We begin our

7

discussion with Supreme Court precedent, and then turn to Eleventh Circuit precedent.

**A**

In *Elrod v. Burns*, 427 U.S. 347 (1976), the Supreme Court, by a 5-3 vote, ruled that a newly-elected county sheriff could not issue wide-ranging terminations for employees who were not sponsored by, or affiliated with, his political party. Justice Brennan's plurality opinion was only joined by Justices White and Marshall, so the concurrence penned by Justice Stewart for himself and Justice Blackmun provided the controlling rationale for the Court's decision: a "non-policymaking, non-confidential employee" cannot "be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." *Id.* at 375 (Stewart, J., joined by Blackmun, J., concurring).[1]

Several years later, in *Branti v. Finkel,* 445 U.S. 507, 519 (1980), the Supreme Court ruled that the continued employment of an assistant public defender, whose duties were to "represent individual citizens in controversy with the state," could not be conditioned on his "allegiance to the political party in control of the county

---

[1] *See generally Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[ ] on the narrowest grounds.").

8

government."   In the course of his opinion for the Court, Justice Stevens wrote that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518 (recognizing, for example, that the governor of a state "may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments").   Nevertheless, because Justice Stevens specifically addressed whether an assistant public defender was a "policymaking" and/or "confidential" employee, and concluded that the answer to each question was no, *see id*. at 519-20, there is disagreement in the legal academy about whether the language in *Branti* purporting to substantively reformulate the *Elrod* standard is dicta. *See generally* C. Fenlon, *The Spoils System in Check? Public Employees' Right to Political Affiliation & the Balkanized Policymaking Exception to § 1983 Liabiity for Wrongful Termination,* 30 CARDOZO L. REV. 2295, 2310 & n. 61 (2009) (citing articles expressing both viewpoints).

More recently, the Supreme Court has summarized *Elrod* and *Branti* as standing for the proposition that "[g]overnment officials may not discharge public

9

employees for refusing to support a political party or its candidates, unless political affiliation is a reasonably appropriate requirement for the job in question." *O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 714 (1996) (extending *Elrod* and *Branti* to independent contractors). In other words, a "government's interest in securing employees who will loyally implement its policies can be adequately served by choosing or dismissing certain high-level employees on the basis of their political views." *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 74 (1990).

## B

*Randall v. Scott,* 610 F.3d 701 (11th Cir. 2010), is the only decision of ours addressing the First Amendment rights of a public employee who is fired for running as a candidate in a contested election. In that case, the chief of staff for a state district attorney alleged that he had been terminated – in violation of his First Amendment rights – because of his decision to run for chairman of the board of county commissioners, a position that the district attorney's husband also coveted. We first noted that "[p]recedent in the area of constitutional protection for candidacy can best be described as a legal morass." *See id.* at 710. After surveying the relevant Supreme Court and Eleventh Circuit cases – involving political patronage dismissals, candidate support dismissals, and restrictions on candidacy – we concluded that the appropriate standard for candidacy dismissals was "a balancing test between a discharged

10

employee's First Amendment right to support a candidate and the state's interest in office loyalty." *See id.* at 713 ("we conclude the constitutional-right-versus-the state's-interest analysis to be no different for a restriction on candidacy than a restriction on candidate support").

Turning to the merits, we reversed the dismissal of the employee's complaint. We held that the "decision to run for office enjoys *some* First Amendment protection," though we declined to say exactly how much. *See id.* Nevertheless, the firing could be sanctioned only "if the state's interest in permitting the [district attorney] to fire [the employee] [was] of sufficient importance to justify the infringement of the [employee's] First Amendment right to run" for office. *See id.* Because the district attorney's "interest in firing [the employee] was, as alleged in the complaint, for purely personal reasons" – i.e., the "discharge was entirely related to [the district attorney's] husband, and [the district attorney's] personal relationship with her husband" –  the state had "no interest whatsoever in preventing [the employee] from running for office." *See id.* We also said in dicta that, had the employee "decided to run against" his boss for the position of district attorney, she "would have good legal reason to discharge him due to the state's interest in office loyalty." *See id.*

So we know, after *Randall,* that although the decision to run for superior court

11

clerk may be protected to "some" degree, Ms. Underwood's First Amendment interest in candidacy has to be balanced against the interests of the state – here Ms. Harkins in her official capacity as clerk – in confidentiality and loyalty. And we know that, if the *Randall* dicta is persuasive, Ms. Harkins would have "good legal reason" to discharge Ms. Underwood after she became a political opponent in the election for clerk.

## C

Because *Randall* held that candidacy dismissals are to be treated like candidate support dismissals, *see* 610 F.3d at 713, some of our prior candidate support cases are relevant here. We now turn to them.

One of the decisions we discussed in *Randall* was *Terry v. Cook*, 866 F.2d 373 (11th Cir. 1989), a case in which a newly-elected county sheriff in Alabama decided to terminate all employees who had opposed him in the election. A number of employees who received a pink slip – deputy sheriffs, clerks, investigators, dispatchers, jailers, and process servers – sued the sheriff, arguing that he had violated their First and Fourteenth Amendment rights. The district court dismissed the complaint with prejudice.

On appeal, we affirmed the dismissal as to the deputy sheriffs, but otherwise reversed. Under Alabama law, we noted, a deputy sheriff is the "general agent of and

12

empowered to enter into business transactions for the sheriff;" "[a]ny transaction within the scope of the sheriff's duties may be acted upon by the deputy;" and "the sheriff is civilly liable for actions committed by a deputy done in the performance of his duty." *See id.* at 377. We then explained that the "closeness and cooperation required between sheriffs and their deputies necessitate[d] the sheriff's absolute authority over their appointment and retention." *See id.* Without looking to see what the deputy sheriffs actually did in the course of their everyday duties, or allowing the case to proceed to discovery on such matters, we held that the sheriff could dismiss them without violating the First Amendment because of the need for loyalty:

> Under the *Elrod-Branti* standard, loyalty to the individual sheriff and the goals and policies he seeks to implement through his office is an appropriate requirement for the effective performance of a deputy sheriff. Such a requirement strikes at the heart of the *Elrod-Branti* least restrictive means test which balances [F]irst [A]mendment rights of the deputies and the need for efficient and effective delivery of public services. We can find no less restrictive means for meeting the needs of public service in the case of the sheriff's deputy than to acknowledge a sheriff's absolute authority of appointment and to decline to reinstate those who did not support him.

*Id.*

We came to a different conclusion as to the other employees who had been dismissed, explaining that, as to them, the need for loyalty to the sheriff could not be determined as a matter of law: "It has not been established that loyalty to an

13

individual sheriff is an appropriate requirement for effective job performance for the remaining positions of clerk, investigator, dispatcher, jailer, and process server. This is a determination that depends on the actual responsibilities of each position and the relationship of each to the sheriff." *Id.* at 377-78.

An earlier candidate support case, not discussed in *Randall* or *Terry*, or cited by the parties or the district court here, is *Stegmaier v. Trammell*, 597 F.2d 1027 (5th Cir. 1979), where a newly-elected county circuit court clerk in Alabama threatened to discharge the existing deputy clerk because she had not supported him (a Democrat) in the election for clerk and had instead supported her boss, the former incumbent clerk (an independent). The deputy clerk sued the clerk, alleging that the planned termination would violate her First Amendment rights to freedom of speech, belief, and association. The district court consolidated the preliminary injunction hearing with the trial on the merits, but strangely no testimony was heard, and the matter was "tried" solely on the deputy clerk's complaint and the clerk's answer and affidavit. *See id.* at 1029-31. The district court ruled in favor of the clerk, and the deputy clerk appealed.

We held in *Stegmaier* that a "public employee occupying a position of confidence, loyalty, and trust by virtue of her status as the single deputy and assistant to an elected official may be discharged solely on the ground of political affiliations

14

without infringing her constitutional rights." *See id.* at 1030. We rejected, as clearly erroneous, the district court's finding that a deputy clerk was a "policymaking" position within the meaning of *Elrod.* Under Alabama law policymaking decisions with regard to the clerk's office were made by the administrative director of the courts, and not by the clerk. And if the clerk did not have policymaking authority, neither did the deputy clerk. *See id.* at 1034-38. But we concluded that, due to the confidential relationship that existed between the two, the clerk – an elected official – could dismiss his deputy clerk without running afoul of the First Amendment. Because of the importance of that rationale here, we quote it at length:

> The public . . . does have the right under the Alabama Constitution to elect its Circuit Clerks and, presumably, attempts to elect capable and honest individuals when doing so. If there is any policy "presumably sanctioned by the electorate," *Elrod v.Burns*, *supra*, 427 U.S. at 367, in its election of one individual as Circuit Clerk over another, it is that of honesty and integrity. This presumption is especially strong where the nature of the Circuit Clerk's position involves the handling of private and public litigant's fees and judgments. *See* Ala. Code tit. 12, §§ 12-17-93, 12-17-94 (1975)[.] When, by statute, a deputy clerk is empowered to conduct all business which the clerk is authorized to conduct, Ala. Code tit. 12, § 12-17-93(2) (1975), and when, by statute, the clerk is subject to civil liability and fines for failure to perform his statutory duties, *id.*, § 12-17-94(b), the Circuit Clerk must be afforded the opportunity to select his single deputy clerk; he must be able to select a deputy in whom he has total trust and confidence and from whom he can expect, without question, undivided loyalty.

*Id.* at 1040.

15

Although we had said earlier in the opinion that whether an employee holds a "policymaking" position is an issue of fact, *see id.* at 1034-35 & n.8, we made no such statement in determining that a deputy clerk was a "confidential" employee under Alabama law. The portion of the opinion dealing with the confidential nature of the position of deputy clerk was devoid of any reference to factual findings or to the clearly erroneous standard of review. *See id.* at 1038-40.[2]

**D**

This is not a pure political patronage case. Nor is it a pure political affiliation case.[3] After all, both Ms. Underwood and Ms. Harkins are Republicans, and there is no indication in this record that the two had different political ideologies. Nevertheless, the political patronage and political affiliation cases are helpful and, as in *Randall*, we turn to them for guidance where appropriate.

In *Randall* we said in dicta that an elected government official can dismiss a confidential subordinate for running against her in an election, without violating the

---

[2]    Because it was decided by the former Fifth Circuit prior to October 1, 1981, *Stegmaier* is binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

[3]    It is also not a case in which an employee was terminated because of things she said during an election. *Cf. Stough v. Gallagher,* 967 F.2d 1523, 1528 (11th Cir. 1992) (applying standard from *Pickering v. Bd. of Education,* 391 U.S. 563 (1968), and *Connick v. Myers,* 461 U.S. 138 (1983), where sheriff fired deputy sheriff for making political speeches on behalf of his political opponent).

16

subordinate's First Amendment rights. After consideration, we find this dicta persuasive because it is consistent with decisions like *Terry* and *Stegmaier,* which allowed elected officials to discharge those immediate subordinates who had not supported them in a contested election. Our holding, which stays within the confines of the case before us, is that an elected official may dismiss an immediate subordinate for opposing her in an election without violating the First Amendment if the subordinate, under state or local law, has the same duties and powers as the elected official. As the Second Circuit has put it, "'[t]here is no likely circumstance in which a shared ideology is more important than when an elected official appoints a deputy who may act in his or her stead.'" *Butler v. New York State Dept. of Law,* 211 F.3d 739, 744 (2d Cir. 2000) (citation omitted).[4]

An immediate subordinate who has the same statutory powers and duties as the elected official for whom she works is the type of confidential employee who can be terminated under *Elrod*, *Branti,* and their progeny (i.e., cases like *Terry* and *Stegmaier*) if she runs in an election against her eventual superior. Without minimizing the First Amendment interest in candidacy, in this scenario the

---

[4]     Given that cases like *Elrod* and *Randall* employ a balancing test laced with a form of heightened scrutiny, we see no need to import a strict scrutiny standard from decisions addressing the constitutionality of laws imposing restrictions on candidacy. *See, e.g., Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983).

subordinate's constitutional rights lose out under a *Randall* balancing analysis. Given the substantial powers and duties that a deputy superior court clerk has under Georgia law – powers and duties which are identical to those of the clerk herself – a person holding that position is essentially the legal alter ego of the clerk. In our view, and as in *Stegmaier,* Ms. Harkins "must be able to select a deputy in whom [s]he has total trust and confidence and from whom [s]he can expect, without question, undivided loyalty." *Stegmaier*, 597 F.2d at 1040. *Cf. Fazio v. City and County of San Francisco,* 125 F.3d 1328, 1335 (9th Cir. 1997) ("We hold that Assistant [District Attorney] Fazio was a policymaker. While his powers under the San Francisco Charter are identical to those of a rank and file ADA, they are also nearly identical to those of the actual DA.").[5]

We recognize that Ms. Underwood's daily duties under Mr. Tucker, the former superior court clerk, did not involve the setting of policy or the exercise of unlimited discretion, and did not extend to the outer limits authorized by Georgia law. In our

---

[5]    At least two circuits have held that a confidential or policymaking subordinate who challenges her current boss in an election (or plans to do so) can be terminated or placed on unpaid leave without an infringement of her First Amendment rights, on the theory that she has called into question her superior's fitness to hold office. *See Carver v. Dennis*, 104 F.3d 847, 852 (6th Cir. 1997) (termination of deputy county clerk, who ran against the clerk and "was trying to take [her boss'] job," was "neutral in terms of the First Amendment"); *Wilbur v. Mahan,* 3 F.3d 214, 218 (7th Cir. 1993) (where such a subordinate plans to run against his superior, the message is that "the boss is not administering the office properly," and "disruption or disturbance need not be proved"). We need not decide today whether this theory is a sound one.

18

view, however, the actual everyday work performed by Ms. Underwood is not determinative. What matters in a case like this one is not what the subordinate actually does on a day-to-day basis, but rather what the subordinate is legally empowered to do under state or local law. In other words, we look at the position in the abstract and at what state or local law allows a person in that position to do, and not at a snapshot of the position as it is being carried out by a given person at a given point in time under a given elected official. *See, e.g., Fields v. Prater,* 566 F.3d 381, 386 (4th Cir. 2009) ("examining the duties and responsibilities of a local director [for county social services department] under Virginia law," and noting that "'courts focus on the powers inherent in a given office'") (citation omitted); *Butler*, 211 F.3d at 744 ("We are not persuaded by Butler's argument that she was not a policymaker because she had to consult her superiors or clients on policy issues. The issue is not whether Butler independently made policy from day to day, but rather what the general required duties of her position were."); *Mummau v. Rank,* 531 F.Supp. 402, 405 (E.D. Pa.) ("Plaintiff's attempt to narrowly define his employment function so as to exclude any policymaking/confidential position fails since the relevant inquiry focuses on the function of the 'public office' involved, *Branti v. Finkel,* 445 U.S. at 518, not the function of the particular employee occupying the office."), *aff'd,* 687 F.2d 9, 10 (3d Cir. 1982) ("We specifically reject appellant's contention that his function [as an

19

assistant district attorney] was purely technical and ministerial and that therefore political affiliation would be an inappropriate criterion for employment. That an assistant district attorney 'could conceivably operate in such a legal/technical matter,' or that appellant in fact so limited himself to the role described is irrelevant."). *Cf. DiRuzza v. County of Tehama,* 206 F.3d 1304, 1309, 1310 (9th Cir. 2000) (because California law does not provide that the title of "deputy sheriff" creates a "clear job category with consistent responsibilities," "the critical inquiry" under *Elrod* and *Branti* "is the job actually performed" by an individual deputy sheriff).

Indeed, in *Cutcliffe v. Cochran*, 117 F.3d 1353, 1358 (11th Cir. 1997) – a case in which deputy sheriffs claimed that their dismissals violated the First Amendment – we acknowledged the "broad holding" in *Terry* "that sheriffs have the authority to fire their deputies for political affiliation reasons." We accordingly recognized in *Cutcliffe* that, given the holding in *Terry*, the plaintiffs could not obtain a "factual determination" under *Branti* of "whether their positions implicate partisan political concerns in their effective functioning." *See id. See also Beauregard v. Olson,* 84 F.3d 1402, 1404 n.5 (11th Cir. 1996) (noting that "[t]he *Terry* court did not undertake a searching assessment of the individual deputies' actual duties").

This categorical approach, in addition to being consistent with our cases, makes practical sense. The fact that an elected official has not given a particular immediate

20

subordinate all of the discretionary or policymaking authority available under state or local law does not prevent that official (or a future one) from changing her mind, or from choosing to expand a subordinate's duties if she is able to hire the subordinate of her choice. *See, e.g., Summe v. Kenton County Clerk's Office,* 604 F.3d 257, 269 (6th Cir. 2010) ("[T]here is nothing in the record that prevents a Kenton  County Clerk from employing a Chief Deputy in a way that requires confidentiality, and we hesitate to bind Kenton County Clerks to employ their Chief Deputies in ways they were employed in the past."); *Regan v. Boogertman,* 984 F.2d 577, 581 (2d Cir. 1993) (that tax collector "may not have [delegated any duties to his deputy [tax receiver]" was not dispositive in determining whether firing of deputy for political reasons violated the First Amendment, as the tax collector might choose to "delegate duties to the [deputy] in the future").  A categorical approach also has the benefit of providing some predictability to legislative bodies, which can decide what powers to give to immediate subordinates of elected officials, as well as giving fair warning to such employees, who will have some notice that their jobs may be subject to termination if they challenge their current or eventual superior  in an election or support their boss' electoral opponent.

We stress, however, that the label or title of the subordinate's position is not controlling.  If state or local law does not give a so-called "deputy" or "assistant" the

21

same powers as the elected official who is her superior, she is not the legal alter ego of the official, and whether she is a confidential employee from whom loyalty can be demanded will ordinarily need to be determined as a matter of fact. *See Gordan v. Cochran,* 116 F.3d 1438, 1441 (11th Cir. 1997) ("Merely being an administrator or supervisor is not sufficient to show that political affiliation is an appropriate job requirement."). *Cf. McCabe v. Sharrett,* 12 F.3d 1558, 1572-73 (11th Cir. 1994) (police chief could transfer his confidential secretary to a less desirable job for marrying one of his subordinates, without violating her First Amendment right to intimate association, because of the need for loyalty and confidentiality).

For example, in *Barrett v. Thomas,* 649 F.2d 1193, 1200-01 (5th Cir. Unit A July 10, 1981), we reviewed, and upheld, a jury verdict in favor of deputy sheriffs who had been fired by a Texas sheriff for not supporting him in an election. We explained that the job duties of the more than 500 deputy sheriffs in the department "range[d] from clerical work to law enforcement" and noted that the sheriff had "offer[ed] no satisfying justification for demanding greater political loyalty from his deputies" than the sheriff in *Elrod* was entitled to expect from his employees: "In a sheriff's department with more than 700 employees, including approximately 550 deputies, the absence of political cohesion between sheriff and deputy can hardly be said to undermine an intimate working relationship." *Id.* at 1201.

22

Here, unlike the situation in *Barrett,* Ms. Underwood was one of three deputy superior court clerks in an office of nine, and the Georgia Legislature chose to give persons holding her job the same powers and duties as the clerk herself.    That allowed Ms. Harkins, when she became clerk, to dismiss Ms. Underwood.  *See Randall,* 610 F.3d at 713; *Terry,* 866 F.2d at 377; *Stegmaier,* 597 F2d at 1040.

## III

Ms. Harkin's termination of Ms. Underwood may well be emblematic of a "civil neighbourly country [beset] with increasingly uncivil politics." *There Goes the Neighbourhood*, Lexington, THE ECONOMIST, Sept. 22-28, 2012, at 42.  Nevertheless, the First Amendment, as interpreted by the Supreme Court and the Eleventh Circuit, did not require Ms. Harkins to graciously embrace and retain her political opponent after becoming superior court clerk of Lumpkin County.  The district court's grant of summary judgment in favor of Ms. Harkins is affirmed.

    **AFFIRMED.**

23

MARTIN, Circuit Judge, dissenting:

I respectfully dissent. The majority makes a significant mistake when it comes to answering a crucial question about how to apply the Supreme Court's decisions in Elrod v. Burns, 427 U.S. 347, 96 S. Ct. 2673 (1976), and Branti v. Finkel, 445 U.S. 507, 100 S. Ct. 1287 (1980).[1] That question is, in determining whether political loyalty is an appropriate requirement for the effective performance of a position held by a public employee—such that the employee can be terminated without violating the First Amendment—are the specific facts regarding the employee's actual job duties relevant? The majority here says that they are not. See Majority Op. at 18–20. Rather, the majority claims, the only thing that needs to be examined is the Georgia statute that contains the formal job description for all deputy clerks in the state. See id.

Our precedent does not support the majority's conclusion that the inquiry is such a narrow and purely legal one. Indeed, in Stegmaier v. Trammell, 597 F.2d 1027 (5th Cir. 1979), the former Fifth Circuit squarely held that whether a public employee holds a position from which she can be lawfully dismissed under Elrod

---

[1] Elrod and Branti involved public employees who were discharged because of their political affiliation. See Elrod, 427 U.S. at 349, 96 S. Ct. at 2678 (plurality opinion); see also Branti, 445 U.S. at 508–11, 100 S. Ct. at 1289–91. Our precedent holds that the governmental interest in political loyalty recognized as valid in Elrod and Branti may also justify the discharge of a public employee who fails to support a particular candidate, see Terry v. Cook, 866 F.2d 373, 377 (11th Cir. 1989); see also Epps v. Watson, 492 F.3d 1240, 1244–45 (11th Cir. 2007), or who decides to run as a candidate herself, see Randall v. Scott, 610 F.3d 701, 713 (11th Cir. 2010).

24

is a "question of fact" that must be resolved in light of the specific evidence that is presented in a given case. Id. at 1034 & n.8.[2] Further, "whether a particular public employee [can be lawfully terminated] can be answered only by analyzing the nature of [that] employee's responsibilities." Id. at 1035. This means that both "[t]he inherent powers and [the] actual job responsibilities of the position involved . . . should be part of the analysis." Parrish v. Nikolits, 86 F.3d 1088, 1093 (11th Cir. 1996) (emphasis added).[3]

I recognize that not all of our prior cases have been clear or consistent on this issue. See, e.g., Cutliffe v. Cochran, 117 F.3d 1353, 1358 (11th Cir. 1997) (construing our opinion in Terry v. Cook, 866 F.2d 373 (11th Cir. 1989), to preclude a factual determination into the actual job responsibilities of deputy sheriffs in Florida). But the appropriate response to this is to apply our prior precedent rule and adhere to the holding of Stegmaier. See Morrison v. Amway Corp., 323 F.3d 920, 929 (11th Cir. 2003) (noting that, under our prior precedent rule, we look to the earliest relevant case in order to resolve a conflict among our decisions). The majority here fails to abide by this basic requirement.

_____

[2] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

[3] At least one of our sister circuits has understood Stegmaier to mean that the actual job responsibilities of a public employee are relevant. See Dickeson v. Quarberg, 844 F.2d 1435, 1442 (10th Cir. 1988).

25

I am also concerned that the majority opinion is not consistent with the thrust of Supreme Court precedent. I realize that, following Elrod and Branti, the Supreme Court has not had the chance to address the specific question presented by Ms. Underwood's case, and our sister circuits have adopted sharply conflicting views. Compare, e.g., Jantzen v. Hawkins, 188 F.3d 1247, 1253 & n.1 (10th Cir. 1999) (holding that the inquiry "must focus on the inherent powers of the positions and the actual duties performed"), and Horton v. Taylor, 767 F.2d 471, 477 (8th Cir. 1985) ("The Branti test is a functional one, focusing on the actual duties an employee performs."), with, e.g., Nader v. Blair, 549 F.3d 953, 961 (4th Cir. 2008) (declining to examine "the actual duties" performed and focusing on the job description only), and Gordon v. County of Rockland, 110 F.3d 886, 888 (2d Cir. 1997) (holding that the focus is on "the written job description" and not "the duties actually performed").

But the Supreme Court's decision in Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1951 (2006), casts doubt on the approach taken by the majority today. In Garcetti, the Supreme Court rejected "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions." Id. at 424, 126 S. Ct. at 1961. In view of that, the Court established that "[t]he proper inquiry is a practical one." Id. The reason for this is obvious. "Formal job descriptions often

26

bear little resemblance to the duties an employee actually is expected to perform."
Id. at 424–25, 126 S. Ct. at 1962.  Thus, while the formal job description might support a particular rationale for restricting an employee's First Amendment rights, the scope of her actual job might not do so.  Relying on the formal job description can therefore result in the excessive restriction of an employee's constitutional rights.

Unfortunately for Ms. Underwood, her case illustrates this danger perfectly. The record here underscores a vast gulf between what is formally provided under Georgia law and what is the reality on the ground.[4]  The Georgia statutes state that deputy clerks have the "same" powers and duties as the clerk herself.  O.C.G.A.  § 15-6-59(b).  However, this was not the reality for the deputy clerks serving under Mr. Tucker.  See Majority Op. at 18.  Nor is this the reality for the deputy clerks serving under Ms. Harkins.  Indeed, in her deposition, Ms. Harkins conceded that her deputy clerks have little discretion in their job and instead are required to follow specific instructions to execute limited, well-defined tasks.  See Doc. 39 at 83–86.  If "there's any uncertainty" about what to do, she indicated, the deputy clerk must go to her to obtain more specific instructions.  Id. at 85–86.

---

[4] In reviewing the summary judgment ruling, I must look at the record in the light most favorable to Ms. Underwood.  See Curves, LLC v. Spalding County, Ga., 685 F.3d 1284, 1289 (11th Cir. 2012).

27

Thus, the formal job description for the deputy clerks "bear[s] little resemblance" to their actual job.  Garcetti, 547 U.S. at 425, 126 S. Ct. at 1962. The reality of this case is that the powers and duties of the deputy clerks depart from those set forth in O.C.G.A. § 15-6-59(b).  Accord Calvert v. Hicks, 510 F. Supp. 2d 1164, 1173 (N.D. Ga. 2007) (finding, based on the record evidence, that "the roles of Clerk and deputy clerk" in Fulton County "are not the same," and that Georgia law only "nominally grants deputy clerks" the same authority as the clerk).  At this stage of the litigation, Ms. Underwood has carried her burden of showing that, in her position as deputy clerk, she was a ministerial-level employee responsible for performing "limited and well-defined tasks."  Id.

This is significant because binding precedent tells us that, insofar as such an employee exercises her First Amendment rights during an election, the governmental interest in political loyalty cannot justify her termination in the aftermath.[5]  Indeed, under Elrod and Branti, the governmental interest in political loyalty can support the discharge of a public employee only if political loyalty is an appropriate requirement for that employee's job.  See Terry, 866 F.2d at 378;

---

[5] Of course, "employees may always be discharged for good cause, such as insubordination or poor job performance."  Elrod, 427 U.S. at 366, 96 S. Ct. at 2686 (plurality opinion).  However, Ms. Harkins admitted for the purpose of her summary judgment motion that she fired Ms. Underwood because Ms. Underwood chose to exercise her First Amendment right to be a candidate.  Majority Op. at 7.

28

see also Epps v. Watson, 492 F.3d 1240, 1245 (11th Cir. 2007).  And political loyalty is not an appropriate requirement for positions that involve "limited objectives and defined duties and [that] do not require those holding them to function as the alter ego of the [elected official] or ensure that the policies and goals of the office are implemented."  Terry, 866 F.2d at 378.[6]

The majority's decision to rely only on the formal statutory job description of the deputy clerks to uphold Ms. Underwood's termination has the effect of burdening Ms. Underwood's First Amendment rights beyond that which the Constitution allows.  This is precisely the kind of danger that the Supreme Court warned about in Garcetti.  See 547 U.S. at 424–25, 126 S. Ct. at 1961–62.

* * *

Unlike the majority, I do not think that we can ignore the facts regarding the scope of Ms. Underwood's actual duties, and in view of those facts, I think Ms. Underwood should be allowed to proceed to trial with her claim.  Because the majority refuses to let her do so, I respectfully dissent.

---

[6] In Terry, we clarified that "[a]lthough it can be said that each job in [an] office implements the policies of the office," political loyalty is not an appropriate requirement for positions that involve "limited and defined roles."  866 F.2d at 378.

29