[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-15851
_____

D.C. Docket No. 4:11-cv-00093-CDL

TERRI EZELL,

Plaintiff - Appellant,

versus

JOAN B. WYNN, et al.,

Defendants,

JOHN DARR,
Individually and in his Capacity as
Sheriff of Muscogee County,
COLUMBUS CONSOLIDATED GOVERNMENT,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(September 23, 2015)

Before TJOFLAT and JILL PRYOR, Circuit Judges, and MOODY,[*] District Judge.

JILL PRYOR, Circuit Judge:

Terri Ezell, a deputy sheriff, appeals the district court's grant of summary judgment to Columbus Consolidated Government ("CCG") and its sheriff, John Darr, on her claims under 42 U.S.C. § 1983. She alleged in her complaint that, upon taking office after winning his election, Sheriff Darr transferred her to a less prestigious position in the sheriff's office with much less responsibility and authority because she supported his opponent in the election. She claims that the transfer violated her rights under the First Amendment against employer retaliation based on political affiliation and under the Fourteenth Amendment against gender discrimination. The district court concluded that (1) her First Amendment claim was foreclosed as a matter of law by this Court's precedent, despite the fact that CCG's civil service system prohibits employment decisions based on political patronage, and (2) her Fourteenth Amendment claim could not proceed to trial because no genuine dispute existed over whether Sheriff Darr's proffered reasons for her transfer were a pretext for discrimination. After careful review, and with the benefit of oral argument, we affirm.

---

[*] Honorable James S. Moody, Jr., United States District Judge for the Middle District of Florida, sitting by designation.

2

## I.

Ms. Ezell has a long and path-breaking record of law enforcement service for CCG.[1] She began working in the Muscogee County Sheriff's Office in 1983 as a correctional officer in the county jail. She was promoted to the position of deputy sheriff in 1985 and continued to climb in rank thereafter. In 2000, she became the first woman to have obtained the rank of major. The highest rank she obtained before Sheriff Darr's administration was commander, which meant that she was senior to majors and third-in-command in the entire sheriff's office.[2] Under then-Sheriff Johnson's administration, her responsibilities as commander included supervising the Muscogee County Jail and its 250 employees, as well as serving on Sheriff Johnson's command staff. In each administration, the command staff consists of the highest-ranking employees in the office, to whom the sheriff customarily turns for counsel in making decisions about office policy.

In 2008, John Darr ran for election against Sheriff Johnson. During the election season, Ms. Ezell showed political support for her supervisor in a number of ways. She put a sign supporting Sheriff Johnson in her yard, attended his campaign's kick-off event, spent time at his campaign headquarters, and attended

---

[1] CCG is a consolidated government comprising the city of Columbus and Muscogee County. It was the first city-county in Georgia to be consolidated, in 1971.

[2] Because CCG and Sheriff Darr moved for summary judgment, we view the evidence and draw inferences in the light most favorable to Ms. Ezell. *See Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1350 (11th Cir. 2015).

his public debates.  She also contributed monetarily to the campaign.  Now-Sheriff Darr was not necessarily aware of these actions, but he assumed that Ms. Ezell supported the incumbent given that she was a member of his command staff.

When Sheriff Darr took office in 2009, he began reorganizing the sheriff's office.  Because he had worked in the jail for years before becoming sheriff, one of his objectives was to improve management of the jail:  he sought to reconfigure what he felt were ineffective lines of communication within the jail and to make better progress toward meeting the terms of a consent order imposed in litigation with the U.S. Department of Justice.  Ms. Ezell had managed the jail up to that point, and so he considered her responsible for these deficiencies.  Within a month, he had replaced not just Ms. Ezell but also the rest of Sheriff Johnson's command staff.  He fired Major Joe McCrea, transferred Major Troy Culpepper to a position within the jail with no specific responsibilities, and transferred Ms. Ezell to the Recorder's Court, where she would supervise only about 12 employees and no longer have access to her police radio.[3]  Some time later, Sheriff Darr returned Major Culpepper to the command staff and made him the head of the Operations Unit.  But Ms. Ezell remained in Recorder's Court, filling a station previously

---

[3] The other member of Sheriff Johnson's command staff, Chief Deputy Jimmy Griffin, resigned.  Human Resources Director Tom Barron's testimony supported Chief Deputy Griffin's impression that Sheriff Darr was going to terminate him because he had been too close to Sheriff Johnson.

occupied by a sergeant, a position four ranks below commander.[4]  Ultimately, Sheriff Darr transferred the Recorder's Court out of the sheriff's office to the office of the city manager; at that time, Ms. Ezell was ordered to discontinue wearing her uniform.

Sheriff Darr's reorganization of the office involved several significant promotions to populate the new command staff as well as a variety of other promotions.  Three members of Sheriff Darr's new command staff were formerly lieutenants, meaning that each enjoyed a promotion of at least two ranks:  Chief Deputy John Fitzpatrick (four ranks), Commander Dane Collins (three ranks), and Major Randy Robertson (two ranks).[5]  All told, Sheriff Darr promoted thirteen officers to the rank of sergeant or higher when he took office, all of whom were male.  By the time the motion for summary judgment was briefed, Sheriff Darr had promoted twenty-eight men and six women to the rank of sergeant or higher.  No woman was promoted to a rank higher than lieutenant, however.

The employees in Sheriff Darr's office were civil service employees. During the previous administration, Sheriff Johnson had placed all the positions in the sheriff's office under a civil service system created by CCG.  Under Georgia

---

[4] From the highest rank down to the lowest rank, the chain of command in the sheriff's office is:  sheriff, chief deputy, commander, major, captain, lieutenant, sergeant, deputy, correctional officer.

[5] The final member of Sheriff Darr's original command staff, Major Mike Massey, was promoted only one rank, from captain.

5

law, a county may create its own civil service system and allow elected officers to place positions under their supervision within the system at their discretion. O.C.G.A. § 36-1-21(a), (b).  Once placed within such a system, a position cannot be removed from the system.  *Id.* § 36-1-21(b).  Within the civil service system, CCG promulgated merit rules providing that "all appointments . . . to positions in the merit system shall be on the sole basis of merit and fitness . . . and that applicants and employees shall not be discriminated against because of . . . political affiliations . . . or any other nonmerit factor."  Dist. Ct. Docket No. 4:11-cv-00093-CDL, Doc. 59-1 at 7.  The Georgia statute providing CCG with the authority to implement its system mandates that the system "shall be administered in such manner and pursuant to such rules and regulations" as CCG specifies. O.C.G.A. § 36-1-21(c).  Thus, the civil service system had the effect of state and local law in prohibiting Sheriff Darr from making employment decisions on the basis of political affiliation.

In 2011, Ms. Ezell joined two other employees in filing this action against CCG, Sheriff Darr in both his individual and official capacities, and other officials. In her complaint, she asserted claims under 42 U.S.C. § 1983 for First and Fourteenth Amendment violations arising out of Sheriff Darr's adverse personnel decisions.  Her First Amendment claim was based on her allegation that political patronage motivated Sheriff Darr's adverse decisions toward her.  Her Fourteenth

Amendment claim cited the same adverse decisions and proceeded on the theory that gender discrimination also motivated them. One such decision of note, apart from her transfer to Recorder's Court, was that Sheriff Darr denied her the opportunity to accumulate "comp time," or compensatory time off, while allowing men of comparable rank to do so.[6]

The defendants moved for summary judgment. First, regarding Ms. Ezell's First Amendment claim, they primarily argued that this Court has already decided that deputy sheriffs have no claim for adverse employment decisions based on political patronage. The reason, as this Court has explained, is that the nature of the sheriff-deputy relationship is such that a sheriff must be able to require absolute loyalty from his deputies for his office to be effective. Ms. Ezell argued in response that CCG's civil service system undermines this conclusion here because it prohibits a sheriff from making employment decisions based on political affiliation. Thus, she reasoned, CCG's sheriff cannot argue that he requires political loyalty for his office to be effective. Second, regarding Ms. Ezell's Fourteenth Amendment claim, the defendants argued that Ms. Ezell's transfer was not an adverse employment decision, and, in the alternative, she could not prove that Sheriff Darr's stated reasons for his personnel decisions were pretextual.

---

[6] Ms. Ezell filed an amended complaint in 2012 that asserted additional claims for gender discrimination under Title VII based on the same allegations on which her Fourteenth Amendment claim was based. No Title VII claims are at issue on appeal.

7

The district court denied the motion for summary judgment as to Ms. Ezell's claims for comp time, but it granted the motion as to all other claims.[7]  Ms. Ezell now appeals the grant of summary judgment on her First and Fourteenth Amendment claims based on her transfer and demotion.

## II.

We review *de novo* the district court's grant of summary judgment, construing the facts and all reasonable inferences therefrom in favor of the nonmoving party.  *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).  Summary judgment is appropriate where the record gives rise to "no genuine dispute as to any material fact," such that "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III.

We first address the First Amendment claim.  The First Amendment protects public employees from adverse employment actions based on political patronage, but only if political loyalty is an inappropriate requirement for the effectiveness of a given employee's position, as that position is defined by state and local law. *Underwood v. Harkins*, 698 F.3d 1335, 1339, 1344 (11th Cir. 2012).  In its best formulation, Ms. Ezell's argument in support of her First Amendment claim is

---

[7] The parties subsequently stipulated to the voluntary dismissal without prejudice of Ms. Ezell's claims for comp time.  After the district court entered a final judgment in favor of the defendants and against Ms. Ezell on her First and Fourteenth Amendment claims, she filed a timely notice of appeal.

8

straightforward:  patronage cannot be necessary to the effectiveness of the CCG sheriff's deputies because CCG's civil service system, which binds the sheriff's office with the force of state and local law, prohibits employment decisions based on political patronage.  We acknowledge that Ms. Ezell's argument is intuitively appealing, but we reject it as foreclosed by precedent.

This Court is now well familiar with the broader question this case presents. Once and again, we have concluded that political loyalty is an appropriate requirement for the job of deputy sheriff because of the "closeness and cooperation required between sheriffs and their deputies" in fulfilling overlapping duties. *Terry v. Cook*, 866 F.2d 373, 377 (11th Cir. 1989); *see Silva v. Bieluch*, 351 F.3d 1045 (11th Cir. 2003); *Cutcliffe v. Cochran*, 117 F.3d 1353 (11th Cir. 1997). CCG's civil service system has no impact on this analysis because, as we further explain below, our precedent compels us to take a categorical approach to the question that is sensitive only to how state and local law define the *duties* of a deputy sheriff.  *See Underwood*, 698 F.3d at 1343–45.  No other legal or practical dimensions to the sheriff-deputy relationship in a particular case are relevant to the inquiry.  Here, although CCG's civil service system granted certain rights to deputy sheriffs under state and local law, Ms. Ezell cannot show how the civil service system modified her statutory *duties* as a deputy sheriff.  Finding no grounding in either Supreme Court or Eleventh Circuit precedent for Ms. Ezell's

9

argument, we conclude that the district court properly granted summary judgment to CCG on her First Amendment claim.

A.

To begin, we review the development of relevant case law. We note as a primary matter that this is a "pure political patronage case," that is, one in which political allegiance is solely at issue, not the content of the employee's political speech. *See Epps v. Watson*, 492 F.3d 1240, 1244 (11th Cir. 2007); *Silva*, 351 F.3d at 1046–47 (identifying similar acts of speech in support of a candidate as "nothing more than bare statements of support for a candidate" (internal quotation marks omitted)). For this reason, the basic test governing this appeal is derived from the two Supreme Court cases establishing the scope of patronage dismissals permitted under the First Amendment, *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980).

In *Elrod*, a controlling concurrence by Justice Stewart established that "a nonpolicymaking, nonconfidential government employee can[not] be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." *Elrod*, 427 U.S. at 375 (Stewart, J., concurring); *see Marks v. United States*, 430 U.S. 188, 193 (1977) (the narrowest opinion that commands a majority controls in the absence of a majority opinion). Although not controlling, the plurality opinion clarified the policy rationale behind

10

limiting the Court's restriction on patronage dismissals to only some public employees:  while as a general matter patronage dismissals "severely restrict political belief and association" and may sometimes hamper the democratic process, the need for government efficiency and effective implementation of policy can justify such dismissals of employees in "policymaking" positions.  *Elrod*, 427 U.S. at 368–72 (plurality opinion).

Four years later, the Supreme Court retreated from its emphasis on the words "nonpolicymaking" and "nonconfidential" to describe employees to whom the general rule applies, when it concluded in *Branti* that the First Amendment protected assistant public defenders from patronage dismissals.  Comprising a new majority that omitted Justice Stewart, the author of the controlling concurrence in *Elrod*, the Court held that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."  445 U.S. at 518.  This later, more specific formulation of the inquiry became known as the "*Elrod-Branti*" standard.  The Court in *Branti* provided clues about the meaning of "appropriate" when it discussed the difficulty of classifying a position cleanly within the "policymaking" and "confidential" exceptions established in *Elrod*.  For example, although a university's football coach obviously formulates policy, the

11

Court reasoned, no one could seriously argue that loyalty to the state's governing party would make the coach more effective at his job. *Id.* Conversely, the Court noted that a position might be neither policymaking nor confidential but nevertheless require a particular political affiliation. The Court hypothesized that an election judge, tasked with supervising a voting precinct during an election, could be discharged for changing her party registration if state election law allowed only one election judge from each of two parties per precinct. *Id.*

Still, regardless of any differences between *Elrod* and *Branti* or ambiguity in how *Branti* clarified *Elrod*'s holding,[8] these cases demonstrated that an employee's substantive responsibilities are the essential focus of the inquiry and that the beliefs of state or local officials as to the necessity of patronage must give way to independent federal review of the position at issue. *See Branti*, 445 U.S. at 518; *Elrod*, 427 U.S. at 375 (Stewart, J., concurring) (implying that effective performance of job duties is a question the Court reviews independently of the hiring authority's perspective).

We first applied the *Elrod-Branti* standard to the dismissal of Alabama deputy sheriffs in *Terry v. Cook*. We concluded as a matter of law that political

---

[8] We have acknowledged before that "because Justice Stevens specifically addressed whether an assistant public defender was a 'policymaking' and/or 'confidential' employee, and concluded that the answer to each question was no, there is disagreement in the legal academy about whether the language in *Branti* purporting to substantively reformulate the *Elrod* standard is dicta." *Underwood*, 698 F.3d at 1339 (citation omitted).

12

loyalty was an appropriate requirement for the job, relying primarily on the overlap in sheriffs' and deputies' duties under Alabama law, the sheriff's civil liability for actions taken by deputies in the course of performing their duties, and the more abstract observation that "[t]he deputy sheriff is the alter ego of the sheriff." 866 F.2d at 377. By contrast, we made no determinations as a matter of law regarding employees in other positions who were subject to dismissal in that case, including the offices of "clerk, investigator, dispatcher, jailer, and process server." *Id.* at 378. Regarding these positions, we decided that further inquiry was necessary into the "actual responsibilities of each position and the relationship of each to the sheriff," as "[s]uch positions traditionally revolve around limited objectives and defined duties and do not require those holding them to function as the alter ego of the sheriff or ensure that the policies and goals of the office are implemented." *Id.*; *see Epps*, 492 F.3d at 1245 (concluding that a tax commissioner's clerk sufficiently pled facts putting her in the group of positions entitled to a factual determination under *Terry*).

Our analysis in *Terry* laid the groundwork first for cases involving deputy sheriffs and, eventually, for the standard that now governs our *Elrod-Branti* jurisprudence generally. Beginning with *Cochran v. Cutcliffe* and later in *Silva v. Bieluch*, we read *Terry* to preclude, as a matter of law, deputy sheriffs' First Amendment claims for adverse employment decisions based on patronage. *See*

*Silva*, 351 F.3d at 1047 (demotion); *Cutcliffe*, 117 F.3d at 1357–58 (termination). In both cases, we reaffirmed *Terry*'s holding as applied to Florida deputy sheriffs without addressing any potential differences between Alabama and Florida deputies in their statutorily defined duties, actual duties, or relationship to the sheriff.  At the same time, in *Cutcliffe* we also noted that this "broad holding" may be in tension with language in *Branti* suggesting that an employee is entitled to a factual determination whether effectiveness in her position requires political loyalty.  *Cutcliffe*, 117 F.3d at 1357–58.  Even so, we adhered to the holding in the deputy sheriff cases without clarifying which facts in *Terry* were critical to it, or, consequently, if or how *Terry* might ever be distinguishable in a deputy sheriff case.

We resolved these open questions in *Underwood v. Harkins*, in which we held that "an elected official may dismiss an immediate subordinate for opposing her in an election without violating the First Amendment if the subordinate, under state or local law, has the same duties and powers as the elected official."  698 F.3d at 1343.  We explained that this test, derived in large part from *Terry*, represents a "categorical" approach that considers only "what the subordinate is legally empowered to do under state or local law," that is, "not . . . a snapshot of the position as it is being carried out by a given person at a given point in time under a

given elected official."[9]  *Id.* at 1344.  But, we acknowledged that, as in *Terry*, a factual determination remains necessary for any subordinate whose statutory duties do not make her the "alter ego" of the hiring authority.  *Id.* at 1345; *see Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1349 (11th Cir. 2013) ("Ordinarily the determination that an employee is a policymaking or confidential employee is a question of fact.  But we have applied a categorical approach based on the statutory authority of an employee when the employee is empowered by the relevant state or local law to act as the alter ego of her employer." (citation omitted)).  In supplying the rationale for our holdings in deputy sheriff cases, *Underwood* made clear that a deputy sheriff fails as a matter of law to plead a First Amendment claim for an adverse employment decision based on patronage wherever her duties and powers are the same as the sheriff's.

---

[9] We acknowledge the position of some other circuits and at least one judge on this Court that a factual determination regarding a subordinate's duties is necessary in every *Elrod-Branti* case.  *See Underwood*, 698 F.3d at 1346–48 (Martin, J., dissenting).  But, our precedent does not require such a factual determination in the limited circumstances before us today.  We note in particular that, although the former Fifth Circuit treated *Elrod*'s policymaker exception as a question of fact in *Stegmaier v. Trammell*, 597 F.2d 1027, 1034 (5th Cir. 1979), and although we are bound by that decision as a whole, *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we decline to ignore the holdings in *Terry* and *Underwood* because, as we recognized in *Underwood*, we do not read *Stegmaier* to preclude a categorical inquiry where the statutory duties of the position at issue are clear and answer the question decisively.  *See Underwood*, 698 F.3d at 1342–43.  More specifically, it does not appear that in *Stegmaier* the Court treated *Elrod*'s confidential exception as a question of fact as it did the policymaker exception, suggesting that the Court did not find a factual determination necessary in all cases implicating *Elrod*.  *See id.* at 1342 (citing *Stegmaier*, 597 F.2d at 1038–40).  Regardless, *Branti* reformulated the test in *Elrod* after *Stegmaier* was decided, and the change in the language is significant enough, in our view, to throw into question the precedential value of lower courts' treatment of *Elrod* before *Branti*.

B.

As explained above, the viability of Ms. Ezell's claim turns on the role of a deputy sheriff under Georgia law. Although we have performed the *Elrod-Branti* analysis in the context of deputy sheriffs in Florida and Alabama, we have not had occasion to do so in Georgia. Under *Terry* and *Underwood*, our task is to review Georgia law to determine if a deputy sheriff has the same powers and duties as the sheriff and is thus the "alter ego" of the sheriff. *See Underwood*, 698 F.3d at 1343, 1345; *Terry*, 866 F.2d at 377. We agree with the district court that this is plainly the case here. *See* O.C.G.A. § 15-16-23; *Veit v. State*, 357 S.E. 2d 113, 115 (Ga. Ct. App. 1987) ("A deputy sheriff is an agent of the sheriff and in effecting the proper discharge of his duties is empowered with the same duties and powers."). This conclusion ends the inquiry. To the extent Ms. Ezell requests a factual determination whether political loyalty is an appropriate requirement in the CCG sheriff's office, that request is foreclosed. *See Underwood*, 698 F.3d at 1344 (citing *Cutcliffe*, 117 F.3d at 1358). To the extent Ms. Ezell argues that the civil service system has modified the *legal* relationship between the sheriff and his deputies, that argument also misses the mark — even if true — because she cannot show how the civil service system modified the duties of a CCG sheriff's deputy. We thus are bound to conclude that political loyalty is an appropriate requirement for the position of deputy sheriff in Georgia.

16

For the above reasons, we conclude that our precedent precludes any *Elrod-Branti* inquiry that exceeds the scope defined in *Underwood*, regardless of the intuitive appeal of Ms. Ezell's argument.  Ms. Ezell's First Amendment claim is foreclosed, and she cannot revive it on the basis that her office was included in CCG's civil service system.

## IV.

We turn now to Ms. Ezell's gender discrimination claim under the Fourteenth Amendment.  Such claims are "subject to the same standards of proof and . . . analytical framework" as gender discrimination claims under Title VII of the Civil Rights Act of 1964.  *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).  When a plaintiff seeks to show discrimination by way of circumstantial evidence, as here, that framework requires a three-step burden-shifting process: (1) the plaintiff must establish a prima facie case, which creates a presumption of discrimination; (2) the employer must rebut the presumption with legitimate, nondiscriminatory reasons for its decisions; and (3) the plaintiff must finally "discredit the proffered nondiscriminatory reasons by showing that they are pretextual."  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  To establish a prima facie case, a plaintiff must show that she (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment

17

action, and (4) was replaced by someone outside the protected class. *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000).

The district court concluded that Ms. Ezell established a prima facie case of discrimination, and we agree. Although CCG and Sheriff Darr dispute that Ms. Ezell's transfer was an adverse employment action, the record as construed in Ms. Ezell's favor demonstrates that it was. Together, the following facts compel a reasonable person's conclusion that the transfer involved a serious "reduction in . . . prestige or responsibility": her removal from the command staff, her assignment to a post formerly held by an officer four ranks lower than she, the reduction in the number of employees she supervised from 250 to twelve, and the eventual instruction she received to discontinue wearing her uniform. *See id.* at 829. The district court also concluded that CCG and Sheriff Darr met their subsequent burden to provide a legitimate, nondiscriminatory explanation for the transfer, and again we agree. Sheriff Darr's explanation for the transfer is "one that might motivate a reasonable employer": he was unsatisfied with ineffective lines of communication and other problems within the jail and decided that new management was an important part of his jail reorganization plan. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004).

Thus, the burden shifts back to Ms. Ezell to show that this proffered reason was pretextual. To survive summary judgment in an employment discrimination

18

case, a plaintiff must "produce sufficient evidence for a reasonable factfinder to conclude that [the defendant's] proffered nondiscriminatory reason" for an adverse employment action "was a pretext for . . . discrimination." *Chapman v. AI Transp.*, 229 F.3d 1012, 1033 (11th Cir. 2000) (en banc).  In particular, we must decide "whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotation marks omitted).

Applying these standards, we hold that Ms. Ezell has failed to create a genuine issue for trial with regard to pretext.  Specifically, she failed to cast sufficient doubt on the reasoning behind Sheriff Darr's reorganization plan such that a reasonable juror could find that his explanation was not believable.  *See Jackson*, 405 F.3d at 1289.  Ms. Ezell was not the only member of Sheriff Johnson's command staff who received a new placement with much less prestige and responsibility when Sheriff Darr took office; Major Culpepper, the only other member of the former command staff still employed in the office, was subject to a materially similar transfer.  It is true that Major Culpepper eventually made his way back to the command staff, but this fact does nothing to change the apparently political nature of Sheriff Darr's original transfer decisions or the special priority

19

that Sheriff Darr placed on reorganizing the part of the office over which Ms. Ezell formerly had control.  We agree with the district court that no inference of pretext is available on the basis of the facts surrounding Ms. Ezell's transfer.

We note nonetheless that the general disparities in promotion and rank of men and women in the CCG sheriff's office under Sheriff Darr give us pause in reaching our decision today.  Regardless of whether such disparities were present before Sheriff Darr's administration, they heighten our sensitivity to any evidence in the record that Ms. Ezell was treated differently than similarly situated men.  In this case, we conclude that those disparities alone cannot give rise to a reasonable inference that gender discrimination was at work in Ms. Ezell's transfer.  The number and modesty of Sheriff Darr's promotions of women allow for the theoretical possibility that discrimination was at work in his employment decisions regarding those women, but Ms. Ezell has failed to show how those disparities support an inference that his jail reorganization plan was a pretext for discrimination against her in particular.  Without more, a jury would have to rely on impermissible speculation to find in her favor.[10]  *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).  She has failed to present enough evidence

---

[10] Ms. Ezell argues that a jury actually did find in her co-plaintiffs' favor in a trial on gender discrimination, but that argument fails at the very least because this Court may not consider a verdict rendered after the summary judgment order in reviewing the order.  *See Chapman*, 229 F.3d at 1026 ("[A] federal appellate court may examine *only* the evidence which was before the district court when the latter decided the motion for summary judgment." (internal quotation marks omitted)).

20

to create a genuine issue whether Sheriff Darr's stated reason for her transfer was pretextual.  Accordingly, the district court properly granted summary judgment on her Fourteenth Amendment claim.

V.

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.