[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-13628
_____

D.C. Docket No. 5:11-cv-00497-MTT

DOCTOR AWANNA LESLIE,
BETTYE RICHARDSON,

Plaintiffs - Appellees,

versus

HANCOCK COUNTY BOARD OF EDUCATION,
GWENDOLYN REEVES,
in her individual and official capacity as Superintendent of
Hancock County Schools,
ANTHONY GILCHRIST,
DENISE RANSOM,
ANNIE INGRAM,
AZZALEE WILLIAMS-ASKEW,
PAMELA LAWRENCE-INGRAM,
in their individual and official capacity as members of
the Hancock County Board of Education,

Defendants - Appellants.
_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(July 12, 2013)

Before PRYOR and JORDAN, Circuit Judges, and PRO,[*] District Judge.

PRYOR, Circuit Judge:

This appeal requires us to decide whether we have jurisdiction over an appeal of a newly elected local school board and whether its individual members violated the clearly established right to free speech of the superintendent of education and her assistant superintendent when the board terminated or demoted them for public comments about local tax policy. While Awanna Leslie served as the Superintendent of the Hancock County School System and Bettye Richardson served as Assistant Superintendent, they came to believe that the Hancock County Tax Commissioner collected taxes at a deficient rate and failed to provide adequate revenue projections, and they publicly complained about these matters. In November 2010, a new Board of Education was elected, and the new Board terminated Leslie and demoted Richardson for their comments about the Tax Commissioner. Leslie and Richardson filed a complaint against the Board and its members in both their official and individual capacities alleging that they had been removed in retaliation for exercising their right to free speech under the First and Fourteenth Amendments, U.S. Const. Amends. I, XIV; 42 U.S.C. § 1983. The Board and its officials moved to dismiss for failure to state a claim and asserted the defense of qualified immunity for the individual members. The defendants argued

---

[*] Honorable Philip M. Pro, United States District Judge for the District of Nevada, sitting by designation.

2

that the plaintiffs' speech was not protected by the First Amendment because it was uttered as part of an employment duty, that the balance of interests outlined in Pickering v. Board of Education of Township High School District 205, Will County, Illinois, 391 U.S. 563, 88 S. Ct. 1731 (1968), favored the Board because the plaintiffs were policymaking or confidential employees, and that qualified immunity protected the individual members of the Board because any right that Leslie and Richardson had was not clearly established.  The district court denied the motion to dismiss.  The individual members of the Board appealed the denial of qualified immunity, and the Board and its officials appealed the denial of their motion to dismiss for failure to state a claim as inextricably intertwined with the appeal of the individual members.  We dismiss the appeal of the Board and its officials for lack of jurisdiction, and we reverse the denial of qualified immunity for the individual Board members because it is not clearly established that a policymaking or confidential employee who speaks about policy, as Leslie and Richardson did, can prevail under the balancing test of Pickering.

## I.  BACKGROUND

Awanna Leslie and Bettye Richardson served as the Superintendent and Assistant Superintendent of the Hancock County School District, respectively.  In early 2009, Leslie and Richardson determined that the Hancock County Tax Commissioner had been collecting taxes at a deficient rate.  Leslie and Richardson

3

believed that this deficient collection of taxes led to the underfunding of the School District.  They also believed that the Tax Commissioner failed to provide adequate projections of tax revenue, which they believed made it impossible for them to prepare a budget for the school district.

Leslie and Richardson publicly commented about the failure of the Tax Commissioner to perform his duties.  Leslie commented about deficient property tax collection at three meetings of the Board of Education and at hearings of the Hancock County Tax Commission.  Her comments also appeared in the Atlanta Journal-Constitution.  In November and December 2009, Leslie also visited the office of the Tax Commissioner to determine the reason for the deficient collection of taxes, and Richardson, a member of Leslie's leadership team, accompanied Leslie on those trips.

In November 2010, voters elected new members to all but one of the seats on the Hancock County Board of Education.  The new chair of the Board, Gwendolyn Reeves, was the sister-in-law of the Tax Commissioner.  In January 2011, the Board fired Leslie.  The Board did not inform Leslie of the reason for her termination.  Reeves then recommended the demotion of Richardson to Gifted Coordinator and then to a teaching position in an elementary school.  The Board demoted Richardson in April 2011.  Leslie and Richardson both believe that the Board was sympathetic to the Tax Commissioner and terminated or demoted them

4

because of their public criticism of him.  Leslie and Richardson filed a complaint against the Board of Education and its members, in their individual and official capacities, for retaliation for the exercise of their right to freedom of speech under the First and Fourteenth Amendments.  See 42 U.S.C. § 1983.

The Board and its members, both as officials and as individuals, filed a motion to dismiss.  Fed. R. Civ. P. 12(b)(6).  The defendants argued that Leslie and Richardson had failed to state a claim upon which relief could be granted because their speech was not protected by the First Amendment because it was uttered in the performance of an employment duty, that the balance of interests under Pickering favored the Board because Leslie and Richardson were policymaking or confidential employees, and that the individual members of the Board were entitled to qualified immunity.  The district court denied the motion to dismiss.  The members of the Board, as individuals, then appealed the denial of qualified immunity, and the Board and its officials appealed the denial of their motion as inextricably intertwined.

## II.  STANDARD OF REVIEW

"We review questions of subject matter jurisdiction de novo."  Belleri v. United States, 712 F.3d 543, 547 (11th Cir. 2013) (quoting Yunker v. Allianceone Receivables Mgmt., Inc., 701 F.3d 369, 372 n.2 (11th Cir. 2012)).  "A motion to dismiss a complaint on qualified immunity grounds will be granted if the

'complaint fails to allege the violation of a clearly established constitutional right.'" Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1199 (11th Cir. 2007) (quoting St. George v. Pinellas Cnty., 285 F.3d 1334, 1337 (11th Cir. 2002)). "Whether the complaint sets forth a violation is a question of law that we review de novo." Id. "We are required to accept the facts as set forth in the plaintiff's complaint as true, and our consideration is limited to those facts contained in the pleadings and attached exhibits." Id.

## III.  DISCUSSION

We divide our discussion of this appeal in two parts. First, we explain why we lack jurisdiction over the appeal of the Board and its officials. Second, we explain why the individual members of the Board are entitled to qualified immunity.

*A.  We Have Jurisdiction Over the Appeal of the Denial of Qualified Immunity, but We Lack Jurisdiction Over the Appeal of the Board and Its Officials.*
.

No party has challenged our jurisdiction in this appeal, but we are required to address our subject matter jurisdiction. Edwards v. Prime, Inc., 602 F.3d 1276, 1287–89 (11th Cir. 2010). "As a general rule, an appeal may be taken . . . only where the district court has disposed of all claims against all parties." Hudson v. Hall, 231 F.3d 1289, 1293 (11th Cir. 2000).

"[A] public official [sued in her individual capacity] may file an interlocutory appeal of the denial of qualified immunity where the disputed issue is

6

whether the official's conduct violated clearly established law." Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1286 (11th Cir. 2000). The individual members appeal the denial of qualified immunity, and we have jurisdiction to review their appeal because "the disputed issue is whether the official[s'] conduct violated clearly established law." Id.

The Board and its officials have also appealed as inextricably intertwined the denial of their motion to dismiss for failure to state a claim, but we lack jurisdiction to consider their appeal. "Under the pendent appellate jurisdiction doctrine, we may address [otherwise] nonappealable orders if they are 'inextricably intertwined' with an appealable decision or if 'review of the former decision [is] necessary to ensure meaningful review of the latter.'" Hudson, 231 F.3d at 1294 (internal quotation marks omitted). We have held that we may exercise "pendent jurisdiction over a party not involved in the main appeal" when "the issues of the nonappealable decision" meet the requirements for our exercise of pendent jurisdiction. King v. Cessna Aircraft Co., 562 F.3d 1374, 1379 n.1 (11th Cir. 2009). But "we [have] interpreted" the decision of the Supreme Court in Swint v. Chambers County Commission, 514 U.S. 35, 115 S. Ct. 1203 (1995), "to bar pendent party jurisdiction" in "an official immunity appeal in which there was an appeal by another party who could not assert official immunity," King, 562 F.3d at 1379 n.1; see also Hudson, 231 F.3d at 1292 n.1 ("[T]he district court's grant of

7

summary judgment to the county and the official capacity defendants does not fall within our pendent appellate jurisdiction."); Harris v. Bd. of Educ. of the City of Atlanta, 105 F.3d 591, 595 (11th Cir. 1997) ("In more recent decisions, the court has [] concluded that we have no pendent party appellate jurisdiction." (internal quotation marks omitted)); Pickens v. Hollowell, 59 F.3d 1203, 1208 (11th Cir. 1995) ("Deputies Wilson and Hollowell request that we review the district court's denial of Rockdale County's motion for summary judgment, but we are foreclosed from doing so by [Swint], which held that we have no pendent party appellate jurisdiction."). And we have held that "we lack jurisdiction to review the Board's appeal on any issue," when a local school board tried to piggy-back on an appeal of the denial of qualified immunity by the individual members of that board. Harris, 105 F.3d at 595.

*B. The Individual Board Members Are Entitled to Qualified Immunity.*

"Qualified immunity offers complete protection for individual public officials performing discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Loftus v. Clark-Moore, 690 F.3d 1200, 1204 (11th Cir. 2012) (quoting Sherrod v. Johnson, 667 F.3d 1359, 1363 (11th Cir. 2012) (internal quotation marks omitted)). "[T]o obtain qualified immunity, an official must first establish that he acted within his discretionary authority." Morton v.

8

Kirkwood, 707 F.3d 1276, 1280 (11th Cir. 2013). Because it is undisputed that the individual board members acted within their discretionary authority, Leslie and Richardson bear the burden to "establish that the [individual board members] violated [their] constitutional rights[] and . . . that the right involved was 'clearly established' at the time of the putative misconduct." Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012). "We are 'permitted to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" Loftus, 690 F.3d at 1204 (quoting Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009)).

The inquiry whether a constitutional violation is clearly established "is 'undertaken in light of the specific context of the case, not as a broad general proposition.'" Terrell, 668 F.3d at 1250 (quoting Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [state official] that his conduct was unlawful in the situation he confronted." Loftus, 690 F.3d at 1204 (quoting Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002)). "To answer this question, we look to law as decided by the Supreme Court, the Eleventh Circuit, or the Supreme Court of [Georgia]." See id. (quoting Barnes v. Zaccari, 669 F.3d 1295, 1307 (11th Cir. 2012)). "[T]he salient question . . . is

whether the state of the law . . . gave [the individual board members] <u>fair</u> <u>warning</u> that their alleged treatment of [Leslie and Richardson] was unconstitutional." <u>Vinyard</u>, 311 F.3d at 1350 (quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002)).

Leslie and Richardson "must 'demonstrate that the contours of the right were clearly established in [one of three] ways.'" <u>Loftus</u>, 690 F.3d at 1204 (quoting <u>Terrell</u>, 668 F.3d at 1255). First, if judicial precedents in an area are tied to particular facts, Leslie and Richardson must "show that a materially similar case has already been decided." <u>Id.</u> (quoting <u>Terrell</u>, 668 F.3d at 1255). Second, if judicial precedents are not tied to particular facts, Leslie and Richardson may "point to a broader, clearly established principle [that] should control the novel facts [of the] situation." <u>Id.</u> (quoting <u>Terrell</u>, 668 F.3d at 1255). To succeed under this approach, "the principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." <u>Id.</u> at 1205 (quoting <u>Terrell</u>, 668 F.3d at 1256) (alteration omitted). Third, in a narrow category of matters, "the conduct involved in the case may so obviously violate [] th[e] constitution that prior case law is unnecessary." <u>Id.</u> (quoting <u>Terrell</u>, 668 F.3d at 1255).

We divide our discussion of qualified immunity in three parts. First, we discuss whether the law was clearly established that a public employer can be held liable for retaliation against a policymaking or confidential employee for speech related to policy or politics. Second, we discuss whether Leslie and Richardson were policymaking or confidential employees. Third, we discuss whether Leslie and Richardson's speech concerned policy or politics.

### 1. The Law Is Not Clearly Established that a Government Employer Can Be Held Liable for Retaliation Against a Policymaking or Confidential Employee for Speech About Policy.

"The law is well established that a state employee may not be discharged for speech protected under the First Amendment," Vila v. Padron, 484 F.3d 1334, 1339 (11th Cir. 2007), but "a public employee's right to freedom of speech is not absolute," id. "To set forth a claim of retaliation, a public employee must show: (1) she was speaking as a citizen on a matter of public concern; (2) her interests as a citizen outweighed the interests of the State as an employer; and (3) the speech played a substantial or motivating role in the adverse employment action." Id. "If the plaintiff establishes these elements, the burden shifts to the defendant to prove it would have made the same adverse employment decision absent the employee's speech." Id.

To determine whether an employee's interest as a citizen outweighed the interests of the state as an employer, we apply the balancing test defined by the

11

Supreme Court in <u>Pickering</u>.  This test seeks "to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of public services it performs through its employees."  <u>Pickering</u>, 391 U.S. at 568, 88 S. Ct. at 1734–35.  The Supreme Court has instructed that "the manner, time, and place of the employee's expression" and "the context in which the dispute arose" are relevant to the <u>Pickering</u> balance.  <u>Rankin v. McPherson</u>, 483 U.S. 378, 388, 107 S. Ct. 2891, 2899 (1987).  The Court has also "recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  <u>Id.</u>

The Supreme Court has developed a different, but related, approach to resolve complaints of retaliation in violation of the First Amendment based on political affiliation or belief in <u>Elrod v. Burns</u>, 427 U.S. 347, 96 S. Ct. 2673 (1976), and <u>Branti v. Finkel</u>, 445 U.S. 507, 100 S. Ct. 1287 (1980).  <u>See</u>  <u>O'Hare Truck Serv., Inc. v. City of Northlake</u>, 518 U.S. 712, 719, 116 S. Ct. 2353, 2357–58 (1996); <u>Brett v. Jefferson Cnty., Ga.</u>, 123 F.3d 1429, 1432–33 (11th Cir. 1997).  In <u>Elrod</u>, the Court held that a "nonpolicymaking, nonconfidential government

12

employee" cannot "be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." 427 U.S. at 375, 96 S. Ct. at 2691 (Stewart, J., joined by Blackmun, J., concurring).   The Supreme Court later clarified, in Branti, that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that [political] affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S. Ct. at 1295.  But the Court has continued to consider whether an employee holds a policymaking or confidential position to determine whether the employee may be dismissed or demoted because of his political beliefs. Id. at 519–20, 100 S. Ct. at 1295.  Employees who serve in these positions can be terminated on the basis of political affiliation or belief because the government has "a compelling interest in infringing [their] First Amendment rights." Rutan v. Republican Party of Ill., 497 U.S. 62, 71 n.5, 110 S. Ct. 2729, 2735 n.5 (1990).

The individual board members argue that it is not clearly established that the Pickering balance does not favor the government employer as a matter of law when a policymaking employee speaks about policy, and we agree.  Neither the Supreme Court, this Court, nor the Supreme Court of Georgia has answered the question whether the Pickering balance of interests favors the government employer when

13

an employee who serves in a policymaking or confidential role can be dismissed based on political affiliation or belief.

The Supreme Court has not addressed the effect on the Pickering balance of determining that an employee holds a policymaking or confidential position under Elrod and Branti.  The Supreme Court has explained, in dicta, only that these inquiries are "different, though related," and that, "where specific instances of the employee's speech or expression . . . are intermixed with a political affiliation requirement[,] . . . the balancing Pickering mandates will be inevitable."  O'Hare Truck Serv., 518 U.S. at 719, 116 S. Ct. at 2357–58.

Although we have addressed whether the Pickering balance or the Elrod/Branti analysis applies in several decisions, see, e.g., McKinley v. Kaplan, 262 F.3d 1146, 1149 n.4 (11th Cir. 2001); Brett, 123 F.3d at 1432–33; Morris v. Crow, 117 F.3d 449, 455–56 (11th Cir. 1997); McCabe v. Sharrett, 12 F.3d 1558, 1561–1570 (11th Cir. 1994); Stough v. Gallagher, 967 F.2d 1523, 1526–28 (11th Cir. 1992), we have not decided the effect on the Pickering balance when an employee is a policymaking or confidential employee, see McKinley, 262 F.3d at 1149 n.4 (applying Pickering in an appeal based primarily on the exercise of an employee's right to free speech); Brett, 123 F.3d at 1433 (remanding for the district court to decide which test to apply); Morris, 117 F.3d at 449, 457–58 (expressing doubts about the merits of a political patronage theory before

14

determining that the Pickering balance favored the employer); McCabe, 12 F.3d at 1569–74 (concluding that a claim based on a right to intimate association failed under either the Pickering balance or the Elrod/Branti analysis); Stough, 967 F.2d at 1526–29 (applying the Pickering balance to an employee's speech and concluding that the employer was not entitled to qualified immunity because the employer had "decided that the [employee's position was] not so closely identified with the [employer] that personal loyalty is required, and that a political dispute between the [employer] and a [person in the employee's position] may not necessarily disrupt normal working conditions"). "We have held that the Elrod-Branti line of cases applies when a public employee suffers an adverse employment action based on party affiliation or political beliefs rather than the content of the employee's speech or expressions," but that "[t]he Pickering analysis . . . applies when a public employee suffers an adverse employment action based on the employee's expressive conduct or speech." McKinley, 262 F.3d at 1149 n.4. But we have not decided their interrelationship when an employer retaliates against a policymaking or confidential employee for speech about policy.

No party has cited any decision of the Supreme Court of Georgia that addresses whether a policymaking or confidential employer has a right not to be retaliated against for speech about policy, and we have not found any decision of the Supreme Court of Georgia on this issue. The only decision of the Supreme

15

Court of Georgia that cites both Pickering and Elrod does not discuss the relationship between those decisions. See Galer v. Bd. of Regents of the Univ. Sys., 236 S.E.2d 617, 619 (Ga. 1977).

In the absence of precedent of the Supreme Court, this Court, or the Supreme Court of Georgia that holds that a policymaking or confidential employee has a right not to be dismissed for speech about policy, Leslie and Richardson cannot "show that a materially similar case has already been decided." Loftus, 690 F.3d at 1204 (quoting Terrell, 668 F.3d at 1255). And Leslie and Richardson must either "point to a broader, clearly established principle [that] should control the novel facts [of the] situation" or prove that "the conduct involved in the case [] so obviously violate[s] [] th[e] constitution that prior case law is unnecessary." Id. at 1204–05 (quoting Terrell, 668 F.3d at 1255). Leslie and Richardson argue that the decision of the Supreme Court in Pickering clearly established that they had a right not to be retaliated against for their speech, but other courts are divided about this issue.

The circuit courts that have addressed whether a policymaking or confidential employee may prevail under the Pickering balance have taken three different approaches. The first approach, taken by the First, Sixth, and Seventh Circuits, "hold[s] that where an employee is in a policymaking or confidential position and is terminated for speech related to political or policy views, the

16

Pickering balance favors the government as a matter of law." See Rose v. Stephens, 291 F.3d 917, 922 (6th Cir. 2002); see also Foote v. Town of Bedford, 642 F.3d 80, 84 (1st Cir. 2011); Bonds v. Milwaukee Cnty., 207 F.3d 969, 978 (7th Cir. 200) ("[W]e held that the rationale for the policymaking employee exception also covered [expression of] viewpoints relating to the policymaking employee's duties."). These courts observe that "disagreement between the employer and the policymaking employee over job-related policy issues causes the same failure of loyalty and shared political mission between superior and subordinate as inconsistent political affiliation or viewpoint." Bonds, 207 F.3d at 978. And because disagreement can undermine the goals of the employer, the employer's interest in effective governance outweighs the employee's interest in speaking when an employee in a policymaking position expresses political or policy views. See Foote, 643 F.3d at 84. These courts also "recognize[] the inherent inconsistency in a rule that protects a policymaking employee who overtly expresses his disloyalty while denying that same protection to one who merely belongs to a different political party." Rose, 291 F.3d at 922. But these courts limit the application of this rule to situations where the speech is about political or policy views because the interest of the employer in having loyal political servants does not apply outside that context. Id. The second approach, taken by the Ninth Circuit, first inquires whether the employee serves in a position in which political

17

affiliation or patronage is a proper consideration and then treats that inquiry as "dispositive of any First Amendment retaliation claim." Biggs v. Best, Best & Krieger, 189 F.3d 989, 994–95 (9th Cir. 1999). If the court concludes that the employee is a policymaker or confidential employee, the employer prevails without applying the Pickering balance. See Fazio v. City & Cnty. of San Francisco, 125 F.3d 1328, 1332 (9th Cir. 1997). The third approach, taken by the Second and Eighth Circuits, limits the application of the decisions of the Supreme Court that address political affiliation. Hinshaw v. Smith, 436 F.3d 997, 1005–07 (8th Cir. 2006); Lewis v. Cowen, 165 F.3d 154, 162–63 (2d Cir 1999). These courts observe that the Supreme Court "has never stated that the discharged employee's position in the employment hierarchy would automatically tilt the Pickering balance in the employer's favor." McEvoy v. Spencer, 124 F.3d 92, 103 (2d Cir. 1997); see also Hinshaw, 436 F.3d at 1006 ("We hesitate to expand the Elrod-Branti exception to a case where a party affiliation is not alleged as a basis for the termination."). But these courts "recognize the necessarily adverse effect an employee's speech on a matter related to the employee's policymaking or confidential duties would have on the factors enumerated in the Pickering balancing test," because the employers have a heightened interest in employee loyalty and the impression of public loyalty when political affiliation is a permissible consideration. Hinshaw, 436 F.3d at 1006–08.

18

No clearly established law bars the termination of a policymaking or confidential employee for speaking about policy. The correct application of the Pickering balance to a policymaking or confidential employee who speaks about policy is not "established with [such] obvious clarity by the case law [] that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Loftus, 690 F.3d at 1205 (quoting Terrell, 668 F.3d at 1256). The members of the Board are entitled to qualified immunity in their individual capacities if Leslie and Richardson were policymaking employees who spoke about policy.

2. A Local School Superintendent in Georgia Is a Policymaking or Confidential Employee.

A local school superintendent under Georgia law is a policymaking or confidential employee for the purpose of the Elrod/Branti inquiry. Ordinarily the determination that an employee is a policymaking or confidential employee is a question of fact. See Underwood v. Harkins, 698 F.3d 1335, 1342 (11th Cir. 2012). But we have applied a categorical approach based on the statutory authority of an employee when the employee is empowered by the relevant state or local law to act as the alter ego of her employer. At oral argument, counsel for Leslie and Richardson conceded that Richardson's complaint rises or falls with Leslie's complaint because Richardson served as Assistant Superintendent and as part of Leslie's leadership team and her speech was in concert with Leslie's speech.

19

Our predecessor court first concluded that an employee was a policymaker or confidential employee based only on the legal definition of that employee's duties. Stegmaier v. Trammell, 597 F.2d 1027, 1040 (5th Cir. 1979). In Stegmaier, a circuit court clerk in Alabama tried to dismiss the deputy clerk because the deputy clerk had not supported the election of the circuit court clerk. Id. at 1030–32. The former Fifth Circuit held that the deputy clerk was a confidential employee without inquiring beyond the statutory authority of the deputy clerk:

> When, by statute, a deputy clerk is empowered to conduct all business which the clerk is authorized to conduct, and when, by statute, the clerk is subject to civil liability and fines for failure to perform his statutory duties, the Circuit Clerk must be afforded the opportunity to select his single deputy clerk; he must be able to select a deputy in whom he has total trust and confidence and from whom he can expect, without question, undivided loyalty.

Id. at 1040 (citations omitted).

We reached a similar conclusion in Terry v. Cook, 866 F.2d 373 (11th Cir. 1989), where a county sheriff in Alabama tried to replace all of the employees of his office who had opposed his election, id. at 374. We held that the sheriff could dismiss the deputy sheriffs. Id. at 377. We did not rely on the actual duties of the deputy sheriffs to reach our conclusion in Terry. Instead, we ruled, "Under Alabama law, a deputy sheriff is the general agent of and empowered to enter into business transactions for the sheriff. Any transaction within the scope of the

20

sheriff's power may be acted on by his deputy." Id. We also concluded that "[t]he deputy sheriff is the alter ego of the sheriff, and the sheriff is civilly liable for actions committed by a deputy done in the performance of his duty." Id. (citation omitted). Based on these factors, we concluded that "[t]he closeness and cooperation required between sheriffs and their deputies necessitates the sheriff's absolute authority over their appointment and/or retention." Id.

We recently acknowledged that we apply a categorical approach based on state law to determine whether an employee is a confidential employee or policymaker. Underwood, 698 F.3d at 1343–44. In Underwood, a newly-elected superior court clerk fired a deputy clerk who had run against her in a primary election. Id. at 1337–38. After a review of Terry and Stegmaier, we held that "an elected official may dismiss an immediate subordinate for opposing her in an election without violating the First Amendment if the subordinate, under state or local law, has the same duties and powers as the elected official." Id. at 1343. We treated the deputy clerk as a policymaking or confidential employee because "a person holding that position is essentially the legal alter ego of the clerk." Id. We acknowledged that the authority of the deputy clerk "did not extend to the outer limits authorized by Georgia law," but we held that the deputy clerk's authority under state law controlled our analysis:

> What matters in a case like this one is not what the subordinate actually does on a day-to-day basis, but rather what the subordinate is

21

legally empowered to do under state or local law. In other words, we look at the position in the abstract and at what state or local law allows a person in that position to do, and not at a snapshot of the position as it is being carried out by a given person at a given point in time under a given elected official.

Id. at 1344. We also stated that the categorical approach made sense because "[t]he fact that an elected official has not given a particular immediate subordinate all of the discretionary or policymaking authority available under state or local law does not prevent that official (or a future one) from changing her mind, or from choosing to expand a subordinate's duties if she is able to hire the subordinate of her choice." Id.

The key factor in our decisions that apply a categorical approach is that the employee was empowered by law to act as the alter ego of her employer. Although these decisions have been limited to "the confines of the case before us," id. at 1343, the rationale of these decisions applies with even more force when an official serves as the alter ego who executes the policies of a legislative body because the official not only "may act" upon matters within the authority of her superior, Terry, 866 F.2d 377, but must act for the policies adopted by the superior to have any effect.

As the superintendent of a local school district, Leslie served in a policymaking or confidential role under our categorical approach to the Elrod/Branti inquiry because she was the executive officer on whom the Board

22

relied for the enforcement of its policies.  Georgia law makes a local school superintendent the alter ego of the local school board.  Georgia law provides that the superintendent "shall be the executive officer of the local board of education" and "shall be the agent of the local board in procuring such school equipment and materials as it may order."  Ga. Code § 20-2-109.  The Supreme Court of Georgia has described the superintendent as the "chief fiscal officer of the board of education."  Hicks v. Arnall, 368 S.E.2d 733, 735 (Ga. 1988).  And Georgia law provides that "[i]t shall be the local school superintendent's duty to enforce all regulations and rules . . . of the local board according to the laws of the state and the rules and regulations made by the local board that are not in conflict with state laws."  Ga. Code § 20-2-109.   The superintendent is an alter ego of the Board, which must rely on her not only to enter transactions on behalf of the Board, but also to enforce its policies.   Although Georgia law provides that a local school superintendent may not bind the local school board when she signs a contract unless the school board permitted the superintendent to enter the contract, see Knight v. Troup Cnty. Bd. of Educ., 242 S.E.2d 263, 264 (Ga. App. 1978), the ability of the Board to limit the authority of a superintendent does not undermine the conclusion that a superintendent is a policymaking or confidential employee. We have explained that "we look at the position in the abstract and at what state or local law allows a person in that position to do, and not a snapshot of the position

23

as it is being carried out by a given person at a given point in time under a given elected official" to determine whether an employee is the legal alter ego of her employer.  See Underwood, 698 F.3d at 1344.  "This categorical approach . . . makes practical sense" because "[t]he fact that an elected [board] has not given a particular immediate subordinate all of the discretionary or policymaking authority available under state or local law does not prevent that [board] (or a future one) from changing [its] mind, or from choosing to expand a subordinate's duties if [it] is able to hire the subordinate of [its] choice."  Id.

### 3.  Leslie and Richardson Spoke About Policy.

The facts alleged in Leslie's complaint make clear that her speech about policy led to her termination.  The complaint alleges that Leslie complained at public meetings of the School Board, at public hearings of the Tax Commission, and in an article in the Atlanta-Journal Constitution about the failure of the Tax Commissioner to collect property taxes at the correct rate and provide accurate revenue projections to Leslie.  The complaint also alleges that the deficient tax collection "result[ed] in the under-funding of the Hancock County School System" and "made it impossible for the Plaintiffs to adequately perform their duties as administrators in the Hancock County School System."  And the complaint alleges that, because of the failure of the Tax Commissioner to provide accurate revenue projections, Leslie and Richardson were "routinely unable to prepare a budget for

24

the Hancock County School System." Ga. Comp. R. & Regs. § 160-5-2-.21. The administration of local taxes and the effect of that administration on the local school district are quintessential policy matters.

Leslie has described her speech as being about policy. In her response to the motion to dismiss, Leslie argued that her "statements actually enhanced [her] daily functioning by putting pressure on the Tax Commissioner to properly fund Hancock County Schools" and that, "[w]ith a proper rate of tax collected, the School District would be able to operate more effectively."

Leslie's complaint against the individual members of the board is barred by qualified immunity, and because Richardson concedes that her complaint rises or falls with Leslie's complaint, Richardson's complaint is barred too. We reverse the denial of qualified immunity for the individual members of the Board.

## IV. CONCLUSION

We **DISMISS** the appeal of the Board and its officials for lack of jurisdiction and **REVERSE** the denial of qualified immunity for the individual members of the Board.