**Michael Todd SNIPES, Plaintiff-Appellant,**

v.

**VOLUSIA COUNTY, a political subdivision of the state of Florida, Defendant-Appellee.**

No. 16-14221

United States Court of Appeals, Eleventh Circuit.

(August 21, 2017)

Jason L. Harr, Noah James Prosser, The Harr Law Firm, Daytona Beach, FL, for Plaintiff-Appellant

James Lawrence Smith, Francis J. Carroll, Jr., Volusia County Attorney's Office, Deland, FL, for Defendant-Appellee

Before HULL, WILSON, and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiff-appellant Michael Todd Snipes was dismissed by defendant-appellee Volusia County (the "County") from his position as a law enforcement officer with the Beach Safety and Ocean Rescue Department (the "Beach Patrol") after making several racially insensitive comments on his Facebook page and in a group text message. He brought, as relevant here, an action under 42 U.S.C. § 1983 alleging that he was wrongfully terminated for exercising his First Amendment right to freedom of speech. The district court granted summary judgment for the County and Snipes appealed. Based on a thor-

ough review of the record and the parties' briefs, we affirm.

## I. Background

A proper view of the instant case requires placing Snipes' statements in context with two, otherwise unrelated, events affecting the County during the relevant time period. First—shortly before the events culminating in Snipe's termination occurred—the Beach Patrol was involved in a public scandal involving adult employees and underage females which significantly, and negatively, affected its reputation in the community. Although Snipes was not involved in that scandal, he was aware of its impact on the Beach Patrol, which included the implementation of a "zero tolerance" policy for any actions that would further tarnish the Beach Patrol's reputation.

Second—as the Beach Patrol was working to rebuild its reputation—central Florida, like much of the rest of the country, was embroiled in the highly publicized trial of George Zimmerman for the shooting death of Trayvon Martin, an African-American teenager. Both the shooting and the trial occurred in neighboring Seminole County and, after a jury acquitted Zimmerman, there were rallies to protest the verdict in Volusia County.

The day after the Zimmerman verdict was announced, Snipes—in a comment he concedes was in reference to Martin—posted the following on his Facebook page: "Another thug gone! Pull up your pants and act respectful. Bye bye thug rip!" On the same day, Snipes initiated a nine-person group text message, to which he sent a picture of Paula Deen with the caption "Y'all niggas want some pie?" One of the members of that group text responded with a picture of Martin and the caption

"Those skittles were to die for," to which Snipes responded "Lol."[1] Similarly, Snipes responded "LOL nice!" to a picture of the Zimmerman jury with Paula Deen's head superimposed on their bodies. Finally, he ended the text thread by sending a picture of Martin and Zimmerman in which Zimmerman was depicted as an African-American and Martin was depicted as a Caucasian.

Snipes was not on duty when he made the Facebook post, but he was on duty when he sent each of his text messages. Three of the recipients of the text messages were current employees of the County, one of whom was Snipes' direct subordinate and another of whom was on duty when he received the messages.

Another of the recipients of Snipes' text messages was a recent retiree from the Beach Patrol who reported them to Snipes' supervisor and subsequently provided copies of both the messages and the Facebook post to an internal affairs investigator. Additionally, an unidentified individual provided copies of the text messages and Facebook post to a local newspaper, which ran an article publishing their content.

Following an internal investigation, Snipes' employment was terminated. He then engaged in an internal appeals process, seeking review of the decision by a five-member board. The board, by a 3-2 vote, recommended that a lesser punishment be imposed. The County Manager—acting within his authority—rejected that recommendation and upheld Snipes' termination.

Snipes then brought this suit, alleging that he was illegally fired for exercising his First Amendment right to freedom of speech. The County did not contest the fact that Snipes' speech—i.e., his Facebook post and text messages—was a motivating

---

1. "Lol" is an acronym for laugh (or laughing) out loud.

factor in his termination. Instead, the County argued that his speech was not protected and, even if it was, that the interests of the County outweighed his right to that speech. On cross-motions for summary judgment, the district court found that "even assuming Plaintiff's Facebook post and text messages constituted protected speech, Defendant's interests as an employer outweigh Plaintiff's interests in making these statements." Accordingly, the court denied Snipes' motion and granted the County's motion. This appeal followed.

## II. Standard of Review

We review summary judgment rulings de novo, drawing all inferences and reviewing all evidence in the light most favorable to the non-moving party. Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. Discussion

As a general rule, a "state employer can not retaliate against a state employee for engaging in speech constitutionally protected under the First Amendment." Stanley v. City of Dalton, 219 F.3d 1280, 1288 (11th Cir. 2000) (citing Rankin v. McPherson, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987)). However, in determining what speech is protected, our case law recognizes that "the state has an interest as an employer in regulating the speech of its employees and attempts to balance the competing interests of the

public employee and the state." Id. (citing Rankin, 483 U.S. at 384, 107 S.Ct. at 2896–97; Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968)).

In order to properly balance these competing interests, we engage in a four-step inquiry:

> First, we consider whether Plaintiff's speech was made as a citizen and whether it implicated a matter of public concern. If this first threshold requirement is satisfied, we then weigh Plaintiff's First Amendment interests against the City's interest in regulating his speech to promote the efficiency of the public services it performs through its employees. The above two issues are questions of law that are decided by the court. The court's resolution determines whether Plaintiff's speech is protected by the First Amendment.
>
> If his speech is so protected, the third stage of the analysis requires Plaintiff to show that it was a substantial motivating factor in his termination. If Plaintiff is able to make this showing, the burden shifts to the City to prove that it would have terminated Plaintiff even in the absence of his speech. Because these final two issues, which address the causal link between Plaintiff's speech and his termination, are questions of fact, a jury resolves them unless the evidence is undisputed.

Moss v. City of Pembroke Pines, 782 F.3d 613, 617–18 (11th Cir. 2015) (citations and quotations omitted). In this appeal, we consider only the second step—also known as the Pickering balancing test—of this inquiry.[2]

---

2. We—like the district court—assume arguendo that Snipes "was speaking as a citizen on a matter of public concern." Accordingly, we need not address the first step of our traditional inquiry. Nor, given our ultimate resolution of this case at the second step, do we need to address the third and fourth prongs of the inquiry.

As noted above, under the second step of our inquiry, we weigh "the employee's first amendment interests against 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989) (quoting Pickering, 391 U.S. at 568, 88 S.Ct. at 1734–35). In striking this balance, we consider "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." Morales v. Stierheim, 848 F.2d 1145, 1149 (11th Cir. 1988).[3] We discuss each in turn.

### A. The Government's Ability to Perform its Duties Efficiently

Courts have routinely afforded substantial deference to public employers when disciplining an employee whose speech threatens to disrupt the efficient functioning of either the employer in general or the employee's department more specifically. Indeed, the Supreme Court has long recognized that:

> [T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatis-

factory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.

Connick v. Myers, 461 U.S. 138, 151, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708 (1983) (quoting Arnett v. Kennedy, 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974) (Powell, J., concurring in part and concurring in the result in part)). As a result, we have held that a "government's legitimate interest in avoiding disruption does not require proof of actual disruption." Moss, 782 F.3d at 622. Rather, a "[r]easonable possibility of adverse harm is all that is required." Id. (citing Anderson v. Burke County, 239 F.3d 1216, 1220–21 (11th Cir. 2001) (finding that a public employer "need not wait for disruption or disturbance to occur before acting")).

■ The County more than carried its burden in this regard. Snipes argues on appeal, as he did before the district court, that the County did not receive any complaints or demands that he be fired and that no rallies or protests were actually held. Whether or not this is true, the County needed to demonstrate only a reasonable possibility that such disruptions would occur. As the County Manager suggested "the fact that the process moved forward and there was a resolution to this issue, which was investigated, action was taken, Mr. Snipes was let go, I believe that that action allowed us to move on without

---

3. We can also take into account "other pertinent considerations" including whether the statement "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Moss v. City of Pembroke Pines, 782 F.3d 613, 621 (11th Cir. 2015) (quoting Leslie v. Hancock Cty. Bd. of Educ., 720 F.3d 1338, 1346 (11th Cir. 2013)).

Snipes raises arguments regarding these "other" considerations only in passing. See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 682 (11th Cir. 2014) ("Abandonment of an issue can also occur when passing references appear in the argument section of an opening brief. . . ."). Even had they been properly raised, they are either wholly without merit or sufficiently addressed by our analysis of other factors. Accordingly, we do not discuss them directly.

having disruption." This view is supported by the President of the Volusia County NAACP, Cynthia Slater, who stated that "the County's swift action in investigating and dismissing Captain Snipes was proper and timely and avoided any further reaction from our branch." Likewise, the President of the Daytona Beach Black Clergy Alliance, Reverend Durham, testified that, if Snipes had not been fired, "I certainly think that we would have probably moved forward with some sort of either demonstration or action" and that "[t]he action would have been in the form of a protest rally."

Nor are rallies or protests the only disruptions with which the County and the Beach Patrol needed to be concerned. As just one other example, Reverend Durham testified that, with regard to the Beach Patrol's ongoing efforts to recruit members of the African-American community, "I think there would have been some real concerns on their part about ... applying for position[s] with the [B]each [P]atrol after something like this had come to light." Thus the Beach Patrol's ability to fully staff a police force that is representative of the community may have been negatively affected.[4]

Moreover, we have held that maintaining the public's confidence in local fire and rescue services is a compelling and legitimate government interest. See Anderson, 239 F.3d at 1221–22 ("Defendant argues that it has a legitimate interest in ensuring that Plaintiff 'maintain[s] public confidence in the ability of [the fire and rescue services] to carry out [their] public safety mission.' We accept this as a compelling

and legitimate government interest." (first alteration in original)). As the NAACP's Slater suggested, Snipes' texts and Facebook messages "make[ ] you wonder if a black person is out in the ocean drowning, if [Beach Patrol officers] would turn their head or if they would take their time to help rescue them." This is precisely the type of public confidence which we have traditionally viewed as a compelling government interest.

In short, if the County had not terminated Snipes it was reasonably possible that there would have been substantial protests and rallies in the community, that the Beach Patrol's ability to recruit new members from the African-American community would have been hindered, and that the public's confidence in the Beach Patrol—and perhaps all County law enforcement—would have been adversely affected. In overruling the recommendation that Snipes not be terminated, the County Manager relied on expectations—ultimately confirmed by two leaders of the local African-American community—developed over nearly four decades in public service. Even were we without this breadth of experience and insight to inform our decision, it is plainly obvious that Snipes' comments could be reasonably expected to cause a disruption in the efficient functioning of the County. Accordingly, the district court was correct to find that this factor weighs in favor of granting the County's motion for summary judgment.

### B. Time, Place, and Manner

██ The time, place, and manner of Snipes' speech further weighs against him.

---

4. We also note that this Court has long-recognized "a heightened need for order, loyalty, and harmony in a quasi-military organization such as a police or fire department." Moss, 782 F.3d at 621. Although there is limited record evidence to support such a conclusion, we would have no trouble believing that

Snipes' comments could disrupt both the internal functioning of the Beach Patrol and their broader interactions with the County's various other law enforcement agencies. We need not rely on such a conclusion however, given that, in any event, the other evidence was more than sufficient.

He sent the text messages while on duty to three other employees, one of whom was a direct subordinate and another of whom was on duty at the time he received the text messages. Cf. Morris v. Crow, 117 F.3d 449, 458 & n.4 (11th Cir. 1997) (finding relevant the fact that plaintiff made remarks "in full view and earshot of her co-workers" and while "on duty"). And while Snipes' Facebook post was made at a time when he was off duty, it was not, as he argues, a "private" message.[5]

The offensive manner of Snipes' speech is also important. Even assuming—we think, rather generously—that Snipes' comments were intended to communicate something of value to the public discourse,[6] there are many ways to communicate ones' thoughts, and the vulgar, derogatory phrases used by Snipes weigh against him. See Hansen v. Soldenwagner, 19 F.3d 573, 577 (11th Cir. 1994) (noting that the public employee's use of "vulgar, insulting, and defiant" language weighed against the employee under the Pickering balancing test).

In short, Snipes' comments were made while he was on duty as an employee of the County. They were made to other employees, including subordinates and those who were on duty. They were made public through his Facebook page. And they were delivered in a vulgar and insulting manner to which we have traditionally declined to

afford protection. Accordingly, this second factor also weighs against Snipes.

### C. Context

▮ Third, we consider the context within which the speech was made. As we have previously noted, Snipes' messages were disseminated at a time when racial tensions were already running high in the area. Considered in that context, the district court concluded that his comments were phrased in an inflammatory manner that was seemingly designed to increase those tensions. Snipes argues on appeal that the district court was wrong to "infer" such an intent from his statements—particularly at the summary judgment stage. We need not reach this question since, regardless of his intent, Snipes should have been—and in fact was—aware that racial tensions in the County were already high, that the Beach Patrol's image had been severely damaged by its prior scandal, and that public trust in the County was already low. Against that backdrop, he then made comments that he knew were likely to further inflame tensions,[7] to further hurt the Beach Patrol's image,[8] and to further erode trust with members of the public.[9] Put simply, it would have been difficult for Snipes to pick a worse context in which to make his comments. Accordingly, this factor also weighs in favor of the district court's decision.

---

5. Indeed—just as he did in the district court—Snipes undermines his own argument in this regard by arguing, later in his briefing, that Facebook is a public forum.

6. Indeed, Snipes does make a halfhearted attempt to argue on appeal that his "own testimony confirmed that his Facebook post was, in fact, a comment regarding Trayvon Martin and society." We need not decide whether this is true since, in any event, the manner in which the "comment" was made still weighs against him.

7. Snipes admitted that his "text message or messages and Facebook post could reasonably be construed as derogatory remarks concerning race."

8. Snipes admitted that at least "some" members of the community would find his statements offensive.

9. Snipes admitted that his "text messages and/or Facebook posts could reasonably be construed to reflect unfavorably on [the] County."

### IV. Conclusion

In short, the district court was confronted with a pure question of law in which all three factors established by this Court cut clearly in favor of the County. The court was correct to grant summary judgment and we, reviewing that decision de novo, will not disturb it. Accordingly, the judgment of the district court is AFFIRMED.